| 1  | 551 |
|----|-----|
| 34 | 402 |

</div>

THE STATE OF MISSOURI, *ex rel.* FREDERICK F. GEHRING, Respondent, *v.* CHARLES CLAUDIUS *et al.*, Appellants

### April 10, 1876.

1. Affidavits in support of a motion to set aside a verdict on the ground of surprise will be disregarded when it appears that the party filing the affidavits anticipated the very evidence by which he alleges he was surprised.

2. When appeals are taken for delay only, damages may be given in actions *ex delicto* in form, on affirming judgments.

3. When a jury is examined on *voire dire*, the mode of examination is referred almost exclusively to the discretion of the trial court.

4. An officer serving a civil process has no right to enter a private house forcibly, against the will of the owner or occupant, and, when presenting himself at such house, it is his duty to answer fully and civilly any question as to the character in which he acts, especially if he wears no badge, and to refuse to answer such questions may make him liable to be treated as a trespasser.

5. The principal constable is liable for the acts of his deputy done under color of his authority.

6. It is the duty of the judge of the *nisi prius* court to preside when counsel address the jury upon the evidence admitted; and whenever, in the absence of the judge, any impropriety or irregularity is committed by the party in whose favor the verdict is rendered, such verdict should be set aside.

7. It is error to allow counsel to read to the jury, in the closing address, anything except the record, the evidence, and the instructions given in the course of the trial, or to refer to, and comment upon, an instruction offered by the other party and refused.

8. When the court, at the close of the testimony, proposes to counsel that they and the jury go to another room to argue the cause, the omission of a party to dissent from such proposal will not prejudice him.

9. When error appears in a record, and there is a possibility that the appellant has been prejudiced by it, the appellate court will reverse the judgment.

APPEAL from St. Louis Circuit Court.

*Reversed and remanded.*

*F. & E. L. Gottschalk*, for appellants, cited : Douglass *v.* Stephens, 18 Mo. 367 ; Garretzen *v.* Duenkel, 50 Mo. 104 ; McKeon *v.* Citizens' R. R. Co., 42 Mo. 80 ; Schouler on Dom. Rel. 638 ; 2 Hill. on Torts (4th ed.), 152, sec. 23 ; 2 Hill. on Torts (3d ed.), 210, sec. 23 ; State *v.* Conover & Dutcher, N. J. 224 ; State *v.* Mann, 21 Wis. 634 ; People *v.* Schuyler, 4 Comst. (N. Y.) 173 ; 2 Hill. on Torts (4th ed.), 19, sec. 19 ; Hill. on Torts (4th ed.), 220, sec. 18 ; Wag. Stat. 1071, sec. 1, p. 1072, sec. 8, p. 1074, sec. 1.

*Marshall & Barclay*, for respondent, cited : Winters *v.* Hannibal & St. Jo. R. R. Co., 39 Mo. 469 ; Pennsylvania & Ohio Co. *v.* Graham, 63 Penn. St. 290 ; Smith *v.* Holcomb, 99 Mass. 552 ; Semaynis' Case, 3 Co. 91, part 5 ; Hagar *v.* Danforth, 8 How. (N. Y.) Pr. 435, and 20 Barb. 16 ; State *v.* Moore, 19 Mo. 369 ; State *v.* Muir, 20 Mo. 303 ; State, to use, *v.* Farmer, 21 Mo. 160 ; Walden *v.* Davison, 15 Wend. 575 ; Woodman *v.* Howell, 45 Ill. 367 ; Phillips *v.* City, 39 Ill. 83 ; State *v.* Woodward, 50 N. H. 527 ; Knowlton *v.* Bartlett, 1 Pick. (Mass.) 270 ; Swart *v.* Hutton, 2 Nev. & M. 426 ; Goetz *v.* Ambs, 27 Mo. 28 ; Calvert *v.* Alexandria, 33 Mo. 149 ; Devlin *v.* Clark, 31 Mo. 22 ; Brady *v.* Connelly, 52 Mo. 19 ; Matlock *v.* Wil-

liams, 59 Mo. 105 ; State *v.* Hamilton, 55 Mo. 520 ; Loyd *v.* Hannibal & St. Jo. R. R. Co., 53 Mo. 509.

GANTT, P. J., delivered the opinion of the court.

Gehring sued Claudius and his sureties on a constable's bond. The charge was that one of the deputies of Claudius had committed a trespass on the plaintiff. This was done in the absence of Claudius, but his deputy entered into the premises of plaintiff under color of legal process addressed to his principal.

The answer denied the petition. The cause was tried in January, 1875, and there was a verdict for plaintiff, with $500 damages.

By the bill of exceptions it appeared that, when the jury was impaneled, the plaintiff's counsel questioned each of them touching his acquaintance with the parties to the suit, and the cause of action, which he stated to be an alleged unlawful arrest made by one Greenwald, deputy constable of Claudius, the other defendants being sureties of Claudius. After the jurors had answered to these questions, the counsel for defendants arose and began to address the jury as follows : " Gentlemen of the jury, this is a case where a deputy constable named Greenwald was going to serve a subpœna on the wife of plaintiff." At this point the plaintiff's counsel objected to the defendant stating his case at that stage of the proceedings. The court sustained the objection, and defendants excepted thereto at the time. The court directed the following questions to be put to the jury :

1. Do any of you know the parties to this case?

2. Do any of you know anything of this suit, which is brought for an alleged unlawful arrest of plaintiff by a deputy constable?

3. Has any one talked to you about this case since you were summoned as jurors?

To which some of the jurors replied that they knew some of the defendants, and the rest knew none of the parties. They all replied that they knew nothing of the suit, or the

circumstances out of which it grew. The plaintiff then exercised his right of peremptory challenge, as did the defendants also, and the remaining twelve were sworn.

The plaintiff testified that on November 22, 1872, he was sitting in his breakfast-room reading a newspaper. His wife was at market. A man knocked at the door. Witness opened it and the man asked if Miss Cary was there. Witness said no such person was there. Then he gave a different name, but not witness'. Witness told him his name was Gehring, but no one named Cary was there, and asked the man what he wanted. He replied he wanted Miss Cary. Witness asked him his business, and he replied it was none of witness' business. Witness replied that if that was so he did not want him any longer in his house. Instead of going, he came into the room and walked towards the kitchen. Witness repeated: "I tell you to go out, if you will not tell your business or your name." He repeated it was none of witness' business. He showed no authority, badge, or paper, and witness took hold of him. He then showed his badge, which was covered by his overcoat. Witness said: "Why didn't you show me that before?" He replied: "Now I will arrest you." Thereupon he took hold of witness, and called to a man outside, who came into the room with an open knife in his hand. They took witness and carried him, without his hat or coat, to a justice's office, when his child brought his hat to him. Greenwald (the trespasser) took it out of her hands and threw it away. They swore out a warrant against witness, who, after some delay, gave bond and was released.

On cross-examination he said he lived on the east side of Carondelet avenue. The man who arrested him did not say he was a constable until he showed his star. Witness told him his wife was not at home; then witness asked who and what he was; he replied: "I will show you what I am."

Greenwald, called for plaintiff, testified that he went to

406 Soulard street, to serve a subpœna on Hannah Gehring. He rapped at the street door and got no answer; then went to the back door. Gehring came to the door and asked what Greenwald wanted; he replied by asking if a party named Gehring lived there; he said no. Greenwald walked in and said he had a subpœna, and produced it, and told Gehring he wanted to summon the witnesses. He said his name was Gehring; Greenwald said he wanted Mrs. Gehring, and did not want him. He said: " You just go out; " witness replied that he would go as soon as he satisfied himself that Mrs. Gehring was not there. With that he stepped towards the kitchen, and Gehring took hold of him and scratched his neck and tore his shirt, whereupon Greenwald showed his star and arrested him with the aid of his partner. This witness told an altogether different story about the hat, and the walk to the justice's office. He said that Gehring was very much excited and very violent.

On the part of defendants, the subpœnas were put in evidence and Claudius was sworn, who testified that Greenwald was his deputy, but he knew nothing of this transaction until after it had occurred. This was all the evidence.

The court gave the following instructions:

1. " The jury is instructed that, if they find for the plaintiff, they will assess the damages at a sum sufficient to fully compensate him for all the injuries sustained by him directly by the acts complained of, in which they may properly consider the mental pain and suffering he may naturally have sustained by reason of the arrest complained of."

2. " The jury is instructed that the deputy constable, in attempting to serve a subpœna, has no right to forcibly enter a private house, against the will of the occupant, and that a resistance of any attempt to make such entry against the will of such occupant is perfectly justifiable in law."

3. " The jury are instructed that the defendants in this action are liable for all acts of Greenwald done under color

of his position as deputy constable, and are answerable for any trespass committed by him under pretense of his authority as such deputy constable, the same as though such acts or trespass were committed by Claudius, the defendant, himself.''

4. '' If the jury believe from the evidence that Greenwald entered the private room of Gehring while the same was in the peaceable possession of said Gehring, and without the invitation or permission of said Gehring, and then refused to leave said room when ordered or requested so to do by said Gehring, then said Gehring had a right to eject him (Greenwald) from said room, using no more force than was actually necessary for that purpose.''

To the giving of these, defendants excepted.

The court also gave the following, at the request of defendants:

'' The court instructs the jury that if they believe from the evidence that plaintiff resisted the deputy constable in serving a subpœna, or interfered with him in the discharge of his duty, or made any affray, or did contend with hot and angry words, then said deputy constable had a right to arrest said plaintiff without warrant, and to bring him before a magistrate having jurisdiction of said offense, to be dealt with according to law.''

And refused the following, defendants excepting:

1. '' That if the deputy constable was outside of the line of his duties as such deputy, in making the alleged arrest of Gehring, then the defendants in this case are not liable, unless they were present, or consented, or directed him to do the acts complained of.''

2. '' The court instructs the jury that if they believe from the evidence that the acts complained of by plaintiff were committed by Greenwald without the knowledge or consent of defendants, and not in the scope or pursuance of his duties as deputy constable, the plaintiff cannot recover.''

3. '' That if they believe from the evidence that plaintiff

had a private difficulty with one Greenwald, and that said Greenwald then committed the act complained of on his own motion, and without any command or order of defendant Claudius, and without the knowledge of said Claudius, then plaintiff cannot recover in this action against any of the defendants. "

4. " If the jury believe from the evidence that Gehring, in the presence of Greenwald, contended with hot and angry words, or in any manner disturbed the peace, then said Greenwald had the authority, without warrant, to arrest said Gehring."

5. "That a constable or deputy constable in his county is a magistrate, and has power to be kept all laws made for the preservation of the peace."

6. "That it was not the duty of Greenwald to show a star, or to show any authority, to plaintiff Gehring, but said Gehring was bound to know that said Greenwald was a deputy constable."

Thereupon the cause was argued to the jury, " and, the judge having left the court-room, plaintiff's attorney did, on his argument, read to the jury" Article 5 of the Amendments to the Constitution of the United States, and comment thereon, and did also tell the jury that defendants, at the close of plaintiff's case, had asked an instruction from the court to the effect that, under the evidence, plaintiff could not recover; that the court had refused it, and that this showed that, according to the law and the opinion of the judge, there was evidence tending to show that plaintiff was entitled to recover.

The jury having found a verdict for plaintiff, defendants moved for a new trial, giving as reasons therefor the admission of improper, and the exclusion of proper, evidence; the refusal of proper, and the giving of improper, instructions; the commenting by the plaintiff's counsel on the refused instruction; the reading by him from the Constitution of the United States; that the verdict was against

evidence; that the damages were excessive; and that the court did not permit the defendants fully to examine the jury.

They also filed a motion in arrest of judgment. The court overruled both motions, and, after the usual exceptions, the case is brought before us on appeal.

1. The first exception relates to the examination of the jury. We think the Circuit Court has committed no error here. The questions which it directed to be put were such as to test the competency of each juror, and this is the only purpose for which that examination is designed. The court was well justified in preventing an address to the jury by either counsel, at that stage, and this is all which it appears to have done. It neglected no means of testing the competency of the jurors, and took the plainest and shortest means of doing this.

2. The first instruction given for the plaintiff is unobjectionable. It does not occupy its proper place amongst its companions. Logically, it is the last of the series; but this is of no moment.

3. The second, third, and fourth instructions given at the instance of the plaintiff may be considered together. We think them a correct exposition of the law applicable to such facts as appear by this record.

An officer serving civil process has no right to enter a private house forcibly, or against the will of the occupant. When an officer knocks at a door of a dwelling, and it is opened, he does not by this opening acquire the right of rudely intruding, telling the proprietor, who inquires what he wants or what his name is, "that is none of his business," and persisting, after he has said that he has a subpœna for the wife of the proprietor and has been told that she is not at home, in searching the premises to satisfy himself of the truth of the information given him. Still less has he the right of thus intruding without the disclosure of his official character. It is very important that no resist-

ance should be offered to the execution of process. It is vital to the stability of our institutions that the law should be regarded as supreme ; that every citizen should yield to it a cheerful obedience ; and that every person charged with its administration or execution should be respected, and, far as needful, aided by every member of society. This obligation should be impressed upon the minds of all, and in proportion to its general recognition a community will be likely to be well or ill governed. But the inviolability of every one's house and person lies at the foundation of our liberty. Where either can be invaded capriciously, and without those checks and precautions which are prescribed (not by the Constitution of the United States, but) by the organic law of the State of Missouri, we shall have lost our right to be called a free people. It is the duty of every person who is charged with the execution of civil process to explain what would otherwise be a trespass, by showing his warrant and his official character. If he chooses to conceal these, he puts himself outside of the protection they give him, and becomes, in the eye of all to whom he refuses to state them, an aggravated trespasser. It need hardly be said that any one effecting admission into a private house for the purpose of stealing, or any other unlawful design, will greatly aggravate his offense by pretending to be an officer of justice, and thus disarming opposition. It is almost as clear that if an officer of justice so conducts himself in the performance of his duty that any impartial observer is at liberty to suppose him a mere malefactor, bent upon the commission of crime, those whom he thus induces to mistake his official character are innocent of any offense when they treat him as a wrong-doer. It is so easy for a constable, or other person charged with duties of a public nature, to give to all concerned notice of the capacity in which he acts ; it is so essential to the freedom of the citizen that it should only be invaded or challenged in the name and by the authority of the law, that it is inexcusable for any one charged with the execution

of legal process to withhold the information—we had almost said the proclamation—that what seems a trespass is only the performance of an official duty ; and he who withholds such information not only takes all the risk of being treated as an insolent trespasser, but is guilty of bringing odium on the law of which he is the unworthy minister.

The principal is liable for all the acts of his deputy. Of course this does not mean that Claudius would have been answerable, criminally, for a felony committed by Greenwald ; but he is answerable for the wrongful doing of any act of his deputy which might have been lawfully done had the deputy been armed with the appropriate process.

In illustration of what we have said we content ourselves. with referring very briefly to the following authorities : *State, to use,* v. *Moore,* 19 Mo. 369 ; *State, to use,* v. *Farmer,* 21 Mo. 160 ; *Hutchinson* v. *York, Newcastle & Berwick R. R. Co.*, 5 Exch. 350 ; *Jackson* v. *Tollett,* 2 Stark. N. P. C. 37 ; *Bastonshill Coal Company* v. *Reid,* 3 Macq. Sc. App. Cas. 266–282, Lord Cranworth's opinion.

The instructions asked by defendants, and refused, were not law, and their refusal was not error. A detailed examination of them is not necessary.

We find no fault with the damages awarded by the jury. The testimony on the subject of the demeanor of Gehring and Greenwald was conflicting. According to the first, there were many wanton acts of insolence and brutality on the part of the deputy ; according to the second, there was an absence of all, or nearly all, of these things. It was for the jury to say which of the witnesses they believed, and how much of the testimony of any witness was, in their opinion, entitled to credit. It was theirs to exclusively decide questions like these, and with their decision of them we cannot interfere. We are, however, of opinion that the judgment in this case must be reversed because of the action of plaintiff's attorney in stating to the jury, in the absence of the judge, that the court had refused an instruction

asked by defendant, and in communicating to the jury the tenor of that instruction.

We have already expressed our opinion that, when the judge leaves the room in which the cause is argued before the jury, there are no adequate means of correcting any irregular practice into which the counsel for the parties may be betrayed. It is plain that the counsel who has the close of the argument possesses a great advantage over the other from the practice of any irregularity; and the temptation to resort to such irregularities is, it would seem, sometimes very strong. The difficulty of obtaining a second trial upon the ground of the verdict being against the weight of evidence is well known to the bar. Appellate courts in this State never interfere with a verdict on this ground; and the right of such interference is very sparingly exercised by the courts of first instance. It is, perhaps, inevitable that this should be so. It is a part of our mode of administering justice. When a party has had one fair trial before jurors of his own selection, or, at any rate, before jurors to whom no valid objection exists, with the advantage of a correct exposition of the law, and the exclusion of all extraneous matter which might improperly influence the triers of the facts in issue, he has no ground for asking for the submission of the issues to another jury. There must be an end of legal contests, as of all other controversies. The interests of the litigants and of society alike demand this; and generally, although it is very difficult to reconcile a party to defeat, the result will be acquiesced in, more or less contentedly, if it be felt that the matter has been once fairly tried. But has there been a fair trial of a cause when, in the absence of the judge, the parties argue the case before the jury, and the counsel having the closing speech states as evidence, to influence the action of the triers of the fact, matters which are not in evidence at all, and which, though perfectly true, should not have been permitted to be stated or made known to them? We think not. In this case

36

plaintiff's counsel stated to the jury that defendants had asked the court to declare, at the close of plaintiff's case, that plaintiff had shown no right to recover; that the court refused to give this instruction; and that it thence resulted that the court was of opinion that plaintiff must have a verdict. The only evidence given by the defendants was of a formal nature; and the argument was very forcible that, if the plaintiff was entitled to recover, regard being had only to the evidence introduced by him, he was hardly less entitled when the evidence of defendants had been put in. Such an argument was very plausible. Had the plaintiff a right to make it?

Of course he could not make it with any effect without prefacing it by the statement of the instruction asked and refused at the end of plaintiff's case. We are of opinion that it was improper for such statement to be made; that the probable effect of it was to damage the defendants; and that, for this reason, the judgment of the Circuit Court must be reversed and the cause remanded for a new trial.

When such irregularities have been called to the attention of the Supreme Court of Missouri, and that tribunal has been asked to reverse a judgment because of their occurrence, its refusal to do so has always been reposed on the grounds which influence us in the present case. The Supreme Court of Missouri has declared, as we have already done (*State* v. *Morgan*), that a very strong case must be made out to justify a review on such matters of practice of the discretion of the judge who was present, and saw and heard all that is alleged as a reason for setting the verdict aside, and who overruled the motion for that reason made in the court below; that it is the duty of the court to check, and, if necessary, to rebuke any such irregularities as are complained of; and that, in short, a very strong presumption is raised of the invalidity of the reasons assigned, if the judge who *saw* and *heard* the whole matter has decided it to be of no weight. *Loyd* v. *Hannibal & St. Jo. R. R.*

*Co.*, 53 Mo. 509. Now, each one of these considerations is felt strongly by us. It is the duty of the judge at *nisi prius* to listen attentively to the statement each counsel makes of the case he proposes to support by evidence; it is, of course, his duty to be vigilant to exclude what is not relevant or competent as evidence; but we fear it is not so generally understood that it is no less the duty of the judge to preside when the evidence is discussed before the jury. We are, as we have already said, aware of the laudable motives which at times influence the court to suggest that the jury and counsel repair, at the close of the evidence, to another room, to argue to the jury upon the evidence, while the court proceeds to the trial of another cause. We have said, and we here repeat, that we consider neither party free to refuse to adopt the suggestion, and, therefore, that neither party is bound by the extorted consent to adopt it. We here add that we consider the defendant generally powerless to protest to any purpose against any such a deviation from regularity as is here complained of. If it occurred in the presence of the court, the judge would be remiss who failed, unsolicited, to rebuke the deviation. Every practitioner knows that a lawyer who objects to what is done or said by his antagonist in the closing speech prejudices his own case, perhaps seriously, unless his objection be crowned with decided results. If a deviation from propriety at such a stage is attempted in the presence of a judge who is properly mindful of his high office, the rebuke which comes unsolicited comes with double force; and it need hardly be said that, if it be understood that such rebukes wait on such aberrations, they will be of very rare occurrence. As little need it be said that their entire disappearance will remove one baneful cause of verdicts not in accordance with the evidence and law.

For the reasons given we are of opinion that the practice of sending the jury and the counsel to another room for the final addresses to the jury is full of danger; that it

tempts to irregularities and improprieties, and that for these, if they occur, there is no remedy except by an assignment of them as a reason for a new trial; that counsel should not be required to object where an objection will naturally lead to an unseemly altercation—a dispute in which there is no arbiter; and that it is the duty of the court, on such occasions, to indulge every presumption against a verdict when such irregularities as are here complained of are shown. We here perceive a new difficulty. The court has heard and seen nothing; the parties are likely to be heated and prejudiced, and their counsel are apt to partake their emotions. Affidavits and counter-affidavits are filed. The court, being human, will be sorely tempted to approve of the step it suggested when the parties went to another room, and to treat the case as if every intendment, every presumption, was in favor of the regularity of the proceedings. The practical conclusion that a well-meant attempt to save time has resulted in a great loss of it will be unpalatable, and will, if possible, be rejected. Under such circumstances we shall have no right to be surprised if the party against whom this irregularity has operated feels that he is injured. This is enough to condemn a practice which is liable to such consequences. The most vital thing in the administration of justice is to decide correctly; second to this, but still very important, is so to decide that each litigant, however unsuccessful, should feel that he has had a full and fair hearing; at any rate, that he should not be at liberty to say or to feel, with any appearance of reason, that he has *not* had a full and fair hearing.

In the case before us it was objected that the counsel for plaintiff not only informed the jury of the tenor of the instruction which the court refused, but that he read and commented on a part of the Constitution of the United States. As to the first article of his alleged irregularity, we have already spoken; as to the second, we satisfy ourselves with saying that of itself it would hardly warrant a

reversal. Obviously it is improper for counsel to read from a book in aid of their arguments to a jury; doubly so when no judge is present; because, although of course the counsel in this case, on both sides, are known to be incapable of such things, it is nevertheless in the power of a designing man to select a single disconnected and misleading sentence, from almost any book that ever was printed, and read it to the jurors as containing an authoritative declaration of the principles which should govern their deliberation. Because the practice is liable to this abuse at the hands of the unworthy, a prudent and honorable advocate will avoid giving it any sanction, and courts should repress it. Anything more harmless than the extract read by the plaintiff's attorney, in the case before us, can scarcely be conceived; and yet it was of no relevancy. The rights of our citizens to be secure in their persons and property do not depend on the Constitution of the United States and the legislation of Congress, but on our own organic law and the statutes of Missouri. These make ample provision for their protection. The corresponding provisions in the Federal Constitution are merely a definition of the obligations resting upon the agents of that government in its own comparatively limited sphere, and, clearly, the parties to this suit were not in the slightest degree affected by the ascertainment of those obligations. Strictly speaking, the Constitution of the United States had no more to do with their controversy than an edict of the emperor of China. The importance of the law of the case being declared by the court alone could hardly be better illustrated than by this mistake of counsel, which we hasten to say we believe to have been entirely innocent in intention, as well as harmless.

Our remarks on this subject are more extended than we could wish, but we desired to give expression to everything we have said on a point which seems to us of great practical importance. We will not say that in no case must a court send the parties and the jury to another room to

argue a cause, after the evidence is closed, or that in no
case must the judge absent himself from the court-room
while the argument is in progress; but we have no hesitation
in saying that the practice is full of risk; that it imposes
upon counsel on both sides the obligation of the most
scrupulous observance of professional propriety; and that,
any disregard of this obligation will incur extreme hazard
of a reversal, if the party chargeable with it has profited by
such disregard. All the judges concurring, this judgment,
is reversed and the cause remanded.

GANTT, P. J., delivered the opinion of the court on
motion for rehearing.

We have carefully examined the motion and reasons for a
rehearing in this cause, and are convinced that it is our
duty to overrule it. The case is of sufficient importance
and interest to justify a statement of the considerations by
which we are led to this conclusion.

The counsel for appellant insist that it appears, by what,
has fallen from the court, that we consider a reversal of the
judgment a concession to the demands of a dry and unmer-
itorious technicality. They proceed to call our attention to
the fact that it has been repeatedly ruled by the Supreme
Court of Missouri that a trivial error occurring in the trial
of a cause will not be ground of reversal, when it is mani-
fest that the error could not have prejudiced the appellant
or plaintiff in error; and they close by invoking the time-
honored maxim, " *consensus tollit errorem,*" to show that.
the judgment of the Circuit Court should be affirmed.

1. As to the first point, we certainly did not intend, nor
do we think the language of our opinion calculated to con-
vey, the idea imputed to it. As the cause must be tried
again, it would be at least culpably indiscreet in us to
utter any expression which could be supposed to be a pre-
judging of the merits of the case—we mean the facts—to
pass on which is the province of the jury. If we thought,

that such a fault could reasonably be imputed to the former expression of our views, we would be careful to modify it; but we cannot think so, and this positive disclaimer of such an intention will, we hope, leave nothing to be desired on this head.

2. The theoretical correctness of the proposition that a judgment should not be reversed for harmless error is undeniable. Yet the difficulty of determining when error is really harmless is so great, the task of applying the criterion is so full of risk, that we can scarcely commend the wisdom or the prudence of adopting the rule as a practical guide to conduct. But the counsel for respondent desire us to do more than this. They wish us to determine that, although in a particular case the result complained of has been reached by methods of which the law disapproves, still the broad merits are so plainly on the side of the prevailing party that it is safe to say the judgment is for the right side, and the appellate court must wink indulgently at a slight disregard of the strict law. This is not an over-statement of the appeal made to us. It is not entirely unfamiliar to human experience. It has been frequently urged upon courts of justice, and is, in our opinion, one of the most plausible, and therefore most pernicious, sentimentalisms that has ever perverted judgment. We dare not, by any sanction of ours, encourage an appeal fraught with such tremendous capacities for mischief. A court exercising appellate jurisdiction does not sit for the purpose of determining whether its individual members sympathize with the fortunes of the litigants whose cases are reviewed by them; nor to declare that, if the matter of fact had been submitted to them sitting as a jury, they would have rendered the verdict which is shown by the record; nor to say that, in any ordinary case, the judgment, though in violation of technical rules, is for the "right party"—for the party having the "moral right" to success. We sit to determine legal rights. In many cases we are, as individuals, sincerely sorry that;

through some casualty, merits which appear to be substantial, have been sacrificed; but we are unable to give relief unless some rule of law has been violated to the disadvantage of the sufferer. At other times we are surprised at the apparent disregard, by a jury, of what seems to us very persuasive evidence, and the preference manifested for what, to us, appears far less satisfactory. If, in such a case, any misdirection as to the admission or exclusion of evidence, or as to the law applicable to it, has, in the hurry of a trial, fallen from the judge of the *nisi prius* court, we gladly correct the error. But, if nothing of this sort appears, we have nothing to do but to affirm the judgment. We cannot conceive of a more perilous, misleading, and odious power than would be implied and usurped if a court should decide a cause upon the general, vague, and irresponsible idea that M is the meritorious, and N the unmeritorious, party to the controversy. Such a power might be exercised at the promptings of the wildest caprice. It would be a purely arbitrary power. Its existence would be fatal to an orderly administration of justice, and its exercise could hardly fail to corrupt the bench. We do not speak here of that coarse form of corruption which consists in the taking of gifts for the betrayal of official duty, but of the insidious overthrow, by the conviction of a total freedom from all logical restraints, from all responsibility to the enlightened criticism of a learned and vigilant profession, of some of the most important guards to a well-considered judgment. If justice is administered according to the principles of jurisprudence, a judge may confidently appeal to the profession in whose presence he stands, and to whose approval he aspires, in vindication of his interpretation of the law. But if, in place of conformity with scientific reasoning and approved precedents, the decision of controversies be reposed on the fanciful notions which this or that judge may entertain of what he chooses to call " substantial justice"—if he who is sworn to administer

the law presumes to think that, in a case of exceptional
hardship, he may "wrest once the law to his authority,"
and, "to do a great right, do a little wr ong"—everything
which is excellent in our institutions will have received a
deadly wound.  For of course no person of sober habits
of thought can fail to see that, instead of the appeal being
made to reflection and judgment, it will, under such cir-
cumstances, be made to feelings alone ; that the "great
right," and the "little wrong" will, nine times in ten, be
determined by the sentimental aspect in which they are
respectively regarded ; that their hues will change as rap-
idly as those of the chameleon, and that one of the least of
the evils attendant upon such an innovation in our practice
will be the loss of all stability in judicial decisions.

 The language in which some courts have justified disre-
gard of an objection purely frivolous and technical—lan-
guage which in almost every instance belongs to the descrip-
tion of *"obiter dictum"*— appears to have misled counsel
into supposing that it is a safe practice to construct foren-
sic logic out of judicial rhetoric.  The ablest judges have
expressed their aversion to *"obiter dicta,"* but of course
no blame can be imputed to advocates who endeavor to sup-
port their views by reference to anything to be found in the
solemn decisions of a court of authority.  The counsel for
the respondent have, with great ability, endeavored to do
this ; but they have, we think, failed to note the practical
injunction contained in one of the best considered utter-
ances to be found in the reports of our own Supreme Court
on the subject under consideration.  What is there said is so
clear, so pointed, that we cannot more satisfactorily illus-
trate our own views than by quoting from the decision to
which we refer.

 "It is, however, suggested that this error should form no
obstacle to an affirmance of this judgment because the
question of probable cause is a legal one, and the proof on

the record shows a want of probable cause. It is true that what constitutes probable cause has been determined to be a legal question, but the jury have still the right to pass upon the facts. When the facts are controverted, or the credibility of the witnesses is to be determined, the evidence must go to the jury" (for which the learned judge cited many cases). "And this was the course of the Circuit Court, in most of the instructions given in this case. Hence, the jury were told that the action of detinue could be maintained only for specific chattels, and there was evidence to show that the goods in possession of Amanda Higgins were not the same goods which had been mortgaged by Van Holls. Higgins to Brant; but the weight and credibility of this testimony was left to the jury. We cannot undertake to conjecture on what point the case turned with the jury, nor what influence the seventh instruction may have exercised upon them. *The instruction was upon a material point in the case, and, though it would seem to have been superfluous, it may not have been harmless.*" *Brant* v. *Higgins*, 10 Mo. 728, Judge Napton delivering the opinion of the court.

We have italicised the very perspicuous and pointed summing up of the law on this subject contained in the last three lines of the citation. It is impossible, in our opinion, to add to the clearness of its statement or the significance of its warning. Indeed, who can venture to say that error ever has been, or ever will be, harmless? If an erroneous ruling has in *any* degree contributed to a result, who can, without arrogating to himself a power of discerning the thoughts and actions of mankind, which savors of presumption, pronounce that, if the error had not been committed, the result would have been unchanged. All that a prudent man will venture to say, in such circumstances, is that *it seems probable* that the result would not have been changed. But to decide dogmatically that it could not possibly have been changed will be held, we think, by all

dispassionate men, to be "argument of slender wisdom."" As we have just seen, it is not a mode of reasoning which. finds favor with the Supreme Court of Missouri.

We confess to some feelings of surprise at the quotation to us, in criticism of our opinion in this case, of the maxim,. "*consensus tollit errorem.*"   If the counsel for respondent have carefully read the paper they impugn, we are at a loss: to understand how they can suppose us forgetful of that time-honored apothegm.   We took pains to express our- selves plainly as to this matter of consent, and it is depressing to find that we have so imperfectly succeeded.   We dwelt upon the unreality of *consent* in such cases, because of the moral duress which effectually prevented anything like free choice.   We aimed to say, in substance, that, when a party was not at liberty to say " no," it was inequitable to hold. him prejudiced by saying " yes ; " and so much stress did. we lay on this distinction that we repeat the expression. of our astonishment that we have been supposed to be neglectful of the rule that a man cannot be heard to object. to what has been brought about by his own concurrence, because we have said that this concurrence shall go for nothing when it is the product of coercion, and not of free will.   The other judges concurring, the motion for a. rehearing is overruled.

