Fred Moll, A Minor, By Maud Harden, His Curatrix, v. Siegfried Pollack, Phillip Pollack, Mrs. Ethel Seibert, Joseph Brennan, Hady Paust Schmidt, Mrs. Haidee Gamer and Mrs. Kate Donovan, Appellants, and Haidee Lucile Idler La Driere, Robert Moll, Elizabeth Nelson, Mrs. Emma Paust, Alma Moll, Mrs. May Hickey, Bernice Lehman, Arthur M. Idler and Edna Gamble.—8 S. W. (2d) 38.

Division Two, April 9, 1928.

*Joseph Block* for appellants.

*Taylor R. Young* and *Abbott, Fauntleroy, Cullen & Edwards* for respondent.

DAVIS, C.—This action is a statutory will contest, instituted in the Circuit Court of the City of St. Louis by the curatrix of the grandson, the only lineal descendant and heir at law of the testator, against the other devisees and legatees named in the purported will, the issues joined involving fraud, undue influence and lack of testamentary capacity. The paper writing, dated February 14, 1921, offered in evidence by the proponents, purporting to be the last will and testament of Frederick Moll, deceased, was found by the jury not to be the last will and testament of deceased. Certain defendants appeal from the judgment entered on the verdict.

The evidence submitted warrants the finding that the testator, Frederick Moll, was, at the time of his decease, a widower, leaving surviving him Fred Moll, his grandson and a minor, as his only lineal descendant and his sole heir at law, the son of testator's deceased son, Edwin Moll and his wife Maud Moll, curatrix herein, who prosecutes this action in behalf of said minor. Maud Moll, after the demise of Edwin Moll and before the death of the testator, intermarried with one George W. Harden. The testator died in the city of St. Louis on September 3, 1922, seventy-six years of age, previously executing the purported will dated February 14, 1921, which was prepared and drawn by Phillip Pollack, a practicing attorney at law, and for more than thirty years the attorney, counselor, financial adviser and intimate friend of the testator, as his answer admits and his evidence shows. The testator survived a sister and three brothers, members of each collateral branch being named in his will. At the time of the execution of the purported will, February 14, 1921, the testator was boarding at the home of Philip Pollack, where he had resided since the October previous. The testator's estate probably aggregated $150,000, more than two-thirds of which consisted of real estate, the annual gross income running

about $11,000, the residue consisting of personalty. The will of February 14, 1921, after bequeathing a substantial sum to May Hickey, who assumed the status of widow and claimed a ceremony of marriage without the solemnity of a certificate, clergy or authorized officer, and after bequeathing various sums to nephews and nieces of his sister and brothers, as well as a few others, all of which aggregated around $20,000, gave the remainder of the estate to Phillip Pollack in trust for his grandson Fred Moll, then about five years of age, and Siegfried Pollack, son of Phillip Pollack, then seventeen years of age, providing, however, for payment by the trustee of the sum of $100 a month to each remainderman until each reached the age of twenty-five years, at which time the respective share was to be delivered to each beneficiary freed of the trust. On November 29, 1920, the testator executed a will, also prepared and drawn by Phillip Pollack while testator resided at Pollack's home, which in its general features was similar to the will of February 14, 1921, now in contest, except that it provided a legacy of $1000 to Maud Moll and $500 to her son Noah Pate; and except that it provided that the corpus of the trust be turned over to the grandson and Siegfried Pollack as each reached his majority, as well as providing for the payment of expenses of illness for each in addition to the sum of $100 a month.

In 1883 the testator was conducting a grog-shop grocery at Jefferson and Chouteau avenues in the city of St. Louis. At the suggestion of Pollack, then in the wholesale liquor business, the testator discontinued the grocery, thereafter conducting what is known as a family liquor store, which seemed to thrive. In 1900 testator moved to a farm near DeSoto, leaving a manager in charge of his saloon. At the farm he employed May Hickey as his housekeeper. His son, Edwin Moll, and her daughter, Elizabeth Hickey, were also there domiciled. Edwin and Elizabeth married, but were later divorced. Pollack, in the meantime having graduated at law, became the attorney of testator. In 1904 the manager Moll had placed in charge of the liquor store became ill, going to Arizona. Testator attempted to manage same, later calling in Pollack when his affairs became muddled, who at first merely assisted him, eventually, however, taking complete charge and managing the business until the advent of prohibition. Testator disposed of the DeSoto farm in 1907, purchasing in 1910 the Denny Road farm in St. Louis County, which he sold in 1912 because he was unable to keep his son interested in it. He later purchased a tract of land at Olivette, in St. Louis County, erecting a home thereon. While domiciled there, testator's son Edwin, on January 14, 1912, married Maud Fields, the divorced wife of William Pate. She had a son Noah Pate. Fred Moll, the grandson of testator, was born to Edwin and Maud on August 19, 1916. Edwin

and his wife, together with Noah Pate, lived at the Olivette farm, for approximately a year and a half, when testator, at the solicitation of Pollack, purchased for his son a home in Maplewood. Here the grandson was born. Edwin died May 15, 1918; the testator making his home with Maud until the November following, giving her the sum of $125 monthly, which he continued through January, 1921.

In 1919 testator purchased a tract of land near St. Clair, in Franklin County, residing there during the summer months. The winter of 1919-20 he lived at the home of May Hickey in St. Louis. The winter of 1920-21, continuing six months from October, he lived at the home of Phillip Pollack. The winter of 1921-22 he lived with his nephew, Adolph E. Moll, at whose home he died. From 1893 to approximately his death, testator contributed monthly allowances to May Hickey. On February 3, 1919, Maud, widow of Edwin Moll, married George Harden, which marriage was kept from the testator for more than two years, for fear that he would discontinue the monthly allowances. In 1920 Maud sold plaintiff's interest in the Maplewood property, by order of the probate court, together with her own interest, both interests being inherited from Edwin Moll. Later she was allowed the sum of $2058.24 for the support of her son Fred, although she received up to and including January, 1921, a monthly sum for the support of Fred from the testator. She used the amount allowed by the probate court for Fred's support to purchase a home, taking the title in her name. During the winter of 1919-20 testator visited his grandson and Maud at the Maplewood home. The following winter on a visit there, he found that Maud had sold the home, which seemed to perturb him, telling Mrs. Hickey on a visit to her that he would leave enough for the boy, but that he did not intend to make further allowance to Maud for his support, as defendants' evidence shows. He also complained of it to Pollack, at whose home he was living, as well as to a neighbor named Loring. However, it was shown that he knew of the intention of Maud to dispose of the Maplewood property and sanctioned it. Defendants' testimony seems to show that he did not know where Maud was living, and hired an investigator to ascertain same, who reported in writing.

Plaintiff's testimony shows that Maud had informed him of her address. About January 28, 1921, Maud, with testator's grandson, called upon him at the home of Phillip Pollack, arranging the visit by telephone. Pollack and his son testified that the elder Pollack was not in the room with the testator, Maud and the grandson, and therefore took no part in the conversation that occurred, although they heard loud talking, but could not distinguish its purport.

One proponent of the will is Phillip Pollack, a practicing lawyer for a number of years, the testator's attorney, who acted as such in

the preparation of the will in controversy, as well as some eight or nine wills previously prepared by him and executed by the testator. Pollack received by the will a diamond ring. Other proponents are Siegfried Pollack and Ethel Pollack Seibert, his son and daughter, the former of whom received by the will one-half of the residuary estate, and the latter $1000. Mrs. May Hickey, testator's reputed common-law wife, and her daughter, formerly the wife of Edwin Moll, Joseph Brennan, Hady Paust Schmidt and Mrs. Kate Donovan, neither of whom were related by blood to testator, received substantial sums. In addition, numerous nephews and nieces received substantial sums. The proponents of the will made due proof of its execution and of the testamentary capacity of the testator in solemn form. By reason of the fiduciary relationship sustained by Phillip Pollack to the testator as attorney and confidential adviser, as admitted in his answer, the proponents first adduced proof, calling twenty-three witnesses.

The evidence develops that Frederick Moll, the testator, was seventy-six years of age at his death. His wife died in 1888. In 1900 his active connection with his saloon business ceased. Thereafter his personal attention was given to his farms. Prior to 1900 he had been a heavy drinker, which, however, failed to prevent him from managing his farms and accumulations. From about 1902 until the advent of prohibition, Moll paid Pollack from $600 to $2400 a year for managing his saloon business and for legal advice. During his sojourn at the DeSoto farm the testator indulged excessively in intoxicating liquor, frequently becoming so intoxicated that he was unable to dress and undress, his condition bordering on delirium tremens. While on the Denny Road farm he also indulged excessively in liquor, continuing it when he moved to the Olivette home, frequently becoming drunk. Upon his birth, plaintiff received his grandfather's name, a source of much pride to his grandfather. The evidence tends to show that Moll's demeanor changed after the death of his son Edwin in 1918. In 1919 he purchased a home near St. Clair, residing there during the summer months, and returning to the city of St. Louis for the winter. During 1919, or shortly prior thereto, the testator was advised that he was suffering from hardening of the arteries, and was told by his physicians to discontinue the use of liquor if he cared to survive, which he did, losing over sixty pounds in weight during the summer and fall of 1920. He also suffered from severe nasal hemorrhages and was in poor health. He was imbued with the idea of making his St. Clair home one of the most beautiful spots on the Meramec River, and sought to obtain a prize which he thought was offered by the State for the most beautiful lawn.

Returning to St. Louis about October 1, 1920, he went to live at the home of Pollack on West Pine Boulevard. He was sick, old, infirm,

eccentric, erratic, and half of the time irrational, suffering from varicose veins, rheumatism, hardening of the arteries, blood pressure of 210, nasal hemorrhages, insomnia, stomach trouble and kidney disease. He was childish and an insomniac. He daily talked out loud to himself and was beset with spells of crying. He frequently contemplated and threatened suicide. He had many hallucinations. He walked the floor, and wrung his hands, worrying over the reports of Pollack that his only living descendant, plaintiff, was not of his blood, but had been taken from a foundling asylum. He was suffering in body and mind from senile debility, superinduced by a forty-year indulgence in alcohol. In this condition in October, 1920, Pollack took him to his home, cooking and prescribing remedies for him. He paid Pollack $100 a month as board and was required by Pollack to arise every morning in a cold room, and when he bought an electric stove Pollack complained to him of the cost of electricity, which Pollack had to pay. Pollack also complained to him about the use of butter on his bread, forcing him to eat pancakes and take medicine against his will. .

Testator, as has been said, purchased the Maplewood home for Edwin, which devolved on Maud and plaintiff at the death of Edwin. Desiring to sell same, she sought the advice and help of Pollack relative to testator executing a sale bond. In this connection Pollack said to Maud, when she asked him to have the testator sign the bond, "Will you turn this money over to Mr. Moll if he goes on your bond, and you can draw from it as he cares to pay?" This happened about a year before the last will was written, as is shown by Pollack's testimony. The record fails to show that Pollack approached Moll in this regard. Testator knew of this sale, making no objection. Maud wrote testator regarding the sale, advising him of her new address. In December, 1920, and January, 1921, testator mailed the monthly allowance to plaintiff at the new address. As early as November 1, 1920, Pollack circulated the rumor that plaintiff was an illegitimate child, that Edwin Moll was incapable of becoming a father, and this child had been taken from a foundling asylum to deceive testator. Pollack reported to testator during the month of January, 1921, that plaintiff's mother had been living at the Maplewood home with a man who assumed the name of Moll, and that she was conducting an assignation house at her present address; that she had settled plaintiff's claim against the United Railways Company for injuries sustained, which had left him a cripple for life. Pollack, fourteen days before the execution of the will, made statements to the testator in the presence of plaintiff's mother as follows:

"Q. Now, did you talk to Mr. Pollack about this gentleman being there? A. Well, about the twenty-eighth or twenty-ninth of January I called up Mr. Pollack and I asked him where Mr. Moll was.

"Q. Had you got your check for January? A. Yes, sir; but I didn't know whether Mr. Moll was stopping then at Mrs. Hickey's or where he was.

"Q. And you called up Pollack? A. Yes, sir; and he told me he was at his home, and I said, 'Will you ask him if he wants to see the baby?' and he said 'yes,' also he told me I could bring the baby over.

"Q. Did you take little Freddie to see Mr. Moll? A. Yes, sir; I did the next day.

"Q. Did Pollack tell you what time to come? A. At ten o'clock.

"Q. Were you there at ten o'clock? A. I think about ten minutes after, or a quarter.

"Q. Did you ring the bell? A. Yes, sir.

"Q. Who answered the bell? A. Mr. Pollack.

"Q. Tell the jury what happened from that time on until you left that house, on that date, on that occasion? A. I went upstairs and Mr. Pollack told me that Mr. Moll was in the rear room and I went up there and Mr. Moll was standing by the radiator, and holding up his pants and he had his back to us, and the baby ran in and grabbed ahold of him, and he tried to lift the baby up like this (indicating) to embrace him and he was so weak and shaky that he couldn't lift him, and the baby pulled him like this (indicating). He always had a habit of asking the baby to stroke his whiskers, and he did him like this, and he patted him on the face, and I waited until he got through with the baby and then I said, 'Hello, grandpa; how are you?' and he said 'I am suffering the tortures of hell,' and he started to cry, and then Mr. Pollack came in and he sat down on the chair and he says, 'Mr. Moll doesn't intend to give you any more money,' and I said, 'Is that so?' and I said, 'What does he intend to do with it, to give it to you?' and he says, 'I don't know whether he does or whether he don't.' He said, 'You went and sold that property in Maplewood and settled with the United Railways Company and have plenty of money. You take it and use it for the support of that child and when that is through you come to me and I will see that the old man takes care of the child.' And he says, 'Who is the man you are living with, posing as Edwin Moll?' and I said, 'I am not living with any man,' and he said, 'Don't you tell me that, you cannot tell me that,' and I said, 'Don't you sit there and tell me that;' and then he said, 'Why did you marry Ed Moll, a syphilitic, for, only to get the old man's money,' and I got mad and went up to him and shook my fist at him and said, 'If I was a man I would lick you,' and he said, 'That is enough of it, you know good and well he is not the father of your child,' and then I began to cry, and then he says, 'Who are the women that you have living in your home?' and I says, 'I have no women in my home,' and he said, 'You are

running an assignation house,' and I said, 'I am not,' and he said, 'You can go and get out of my house,' Mr. Pollack, said, and I said, 'I will get out of here,' and I said, 'I will when I get my child wrapped up.' It was winter time, and I wrapped my child up and turned around and grandfather had been walking up and down; and he never said a thing all the time that Mr. Pollack was talking to me, and he didn't say, 'Don't say it or anything.' He was just like he was ready to drop all the time. And then I said to the baby, 'Freddie, kiss your grandpa and tell him he knows where we live and any time he wants to visit us he is welcome. Goodbye, Grandpa,' and Pollack followed me down the steps and when I shut the door I slammed it."

The evidence further shows that Pollack told Alice Moll, while the testator was on his deathbed at her home, that he had in 1921 in the presence of the testator made statements to plaintiff's mother that the plaintiff was illegitimate and was not a Moll, and that a man suffering from the disease of Edwin Moll was incapable of having a child. The foregoing is in accordance with the version placed upon it by the testator in repeating to his blood relations what had occurred at the interview. There seemed to be no real ill-feeling between the testator and his blood relations. The testator seemed to have great confidence in Adolph E. Moll and his wife, and Mrs. Idler and her husband. With the exception of his grandson, he seemed to think more of these relations than anyone else, and neither of them received one dollar of his bounty by his will, although their children were remembered. They visited him and he visited them, and sometime before his death went to the home of Adolph E. Moll to spend his last days.

The will was executed in the office of Pollack and was witnessed by Pollack, Chester H. Krum and James Boyd Hill. Pollack could not remember the contents of any of the wills prior to the one of November 19, 1921, the tail ends of which were produced by him at the trial. When on July 4, 1922, Adolph E. Moll, a nephew, and Pollack were called to St. Clair to take the testator to his dying bed at Adolph E. Moll's home on Waterman Avenue, Pollack gave Mrs. Alice Moll, wife of Adolph E. Moll, who nursed deceased to the date of his death, instructions to refuse his relatives permission to see him, and warned her particularly that, if she permitted the little grandson to see him, he would likely change his will and delete from his last will, which he had executed in January, 1922, a ten-thousand dollar bequest to Adolph E. Moll, and would make a new will, leaving everything to Mrs. Hickey and the boy. Alice obeyed the foregoing instructions and the testator died without having seen his grandson after January 29, 1921, the day that plaintiff's mother states that Pollack abused her in the testator's presence. In August,

1922, plaintiff's mother learned that testator had been taken to Adolph E. Moll's home on July 4th very ill. She had gone that day to see him at St. Clair, where Mr. Courtney in charge, by instructions of Pollack, had refused to let her in. On returning to St. Louis, she called up Moll's home, but was told that the testator was sleeping. Fred never saw his grandfather. Such other facts as are pertinent, if any, will be found in the opinion.

I. The record herein comprises nearly nine hundred pages of printed matter. In addition thereto, the briefs containing statements, points and arguments run more than two hundred and fifty pages, in which are cited many authorities. There are many facts found in the bill of exceptions, many inferences drawn from the evidence, and many contentions as to the force of certain evidence, which we conclude to be inexpedient to detail or write concerning, which would not change the result herein, but which we have considered.

This is a will contest and consequently an action at law, and the rule as to substantial evidence to support a verdict applies. Thus, if there was substantial evidence before the jury as to the issues involved, a question of fact was raised, which was for their determination solely. In other words, in an action at law, an appellate court is powerless under our principles to determine a question of fact. Our power in that regard extends no further than to decide whether the record evolves substantial evidence to support the verdict. Consequently, on the issues here joined, the court is permitted to consider only the evidence for the contestant and the undisputed documentary and admitted oral evidence for the proponents. to determine whether the record contains substantial evidence in that respect. [Craig v. Rhodes, 298 S. W. 756.]

II. Appellants contend that the evidence not only conclusively shows Moll's testamentary capacity to make a will, but that the record is void of evidence tending to show that he was of unsound mind when making it. The evidence tends to show that during his life, until his physicians advised him in 1919 to quit drinking, he was a heavy and excessive drinker of alcohol. Defendants' witness, Dr. Kurtzeborn, stated that from 1907 to 1914 he treated him once or twice a year for alcoholism, his condition bordering on delirium tremens. Dr. Parsons, also defendants' witness, stated that he saw him only during his last illness, treating him for about three weeks, at which time he was suffering from inflammation of the bladder, disease of the kidneys, possibly nephritis, and arteriosclerosis, all of which, in his opinion, testator had had for a year and a half. Arterio sclerosis, so he said, weakens

the brain, will power and general intelligence. Three lay witnesses, intimately associated with him, after being properly qualified, stated that testator was of unsound mind.

Dr. Duckworth, who had had, in addition to a postgraduate medical course at Johns Hopkins, army experience in a base hospital in treating mental diseases, and thereafter shell shocked soldiers, having made a special study of mental and nervous diseases, stated that he first treated Moll at St. Clair, Missouri, in 1919, when Moll called on him. Testator said to him on his arrival, "I am in good health and those damn doctors I am going to lied and I want you to look me over." He found him suffering with cystaltic blood pressure at 210, chronic nephritis and miscroscopically he showed blood cells and pus. He also had chronic cirrhosis of the liver and very bad varicose veins. Testator told him that he suffered with head pains, which bothered him. Witness also stated that he found Moll suffering from senile debility, brought on by excessive indulgence in alcohol. Senile debility was described as a mental nervous disorder accompanying old age, especially where indiscreet, the mind being that of a child. Sometimes one can reason with them and sometimes one cannot. They have lucid intervals and may have them for a week or two. He further stated that the discontinuance of alcohol by a man from seventy to seventy-three years of age, who had been drinking continuously and excessively, produces a mental shock as well as a shock to the full nervous system. In some instances they lack a reasoning power.

Dr. Simon, witness for contestant, defined senile dementia as an abnormal condition of the mental faculty caused by the softening of the brain substance. It is incident to old age and is a gradual dying off of the brain. It is a so-called rotting off at the top, just as an old tree rots off at the top first. It is characterized by certain evidence of the enfeeblement of the mind, produced particularly by old age, and it is largely due to contraction in the arteries of the brain, which in turn is caused by hardening of the arteries, due to a lack of nourishment to certain parts of the brain on account of the diminution of the caliber of the blood vessels. It manifests itself as to one individual by simply showing an enfeeblement of the mind, and in others by loss of memory, faulty judgment, inability to concentrate, or in mild delusion, carelessness about dress and a general forgetfulness about recent things. Senile dementia invariably weakens the will power. While Dr. Simon had never seen testator, he answered hypothetical questions to the effect that alcohol, if taken over a long period of time, will produce hardening of the arteries and deterioration of the brain substance; that if one accustomed to drinking ceases, he becomes abnormal and his brain does not function.

The foregoing constitutes substantive evidence that testator was of unsound mind, thereby rendering the issue a question of fact for the jury, whose finding in that regard we may not disturb.

III. Defendants' next contention is that the record is without evidence of undue influence. While testator was probably a man of strong will throughout the greater portion of his life, the evidence advises that as early as 1919, then a man of seventy-two or seventy-three years of age, he was a senile debilitant, the condition being progressive, probably caused by the excessive use of alcohol during his life. At the time of his execution of his will, he was feeble, mentally and physically weak, and afflicted with arterial sclerosis and other ailments which undermined and affected his mentality. His condition rendered him subject to facile influence. Pollack had been his attorney and adviser for some thirty-five years. It was, therefore, natural that he should prepare the document in controversy, but rather unnatural that the attorney preparing the will should permit himself and family to be greatly benefited by it. The facts obtaining that he prepared and drew the will and that he and his family benefited by it established a confidential relation, from which arises a presumption of undue influence, casting the burden of proof on defendants to show that the will was executed freely and without such influence. Pollack attempted to meet this issue by testifying that he merely followed the suggestions and orders of Moll in the preparation of the will, without influence on his part; but that Pollack had an influence over Moll and assumed to act for him on occasions, is demonstrated by Pollack's testimony regarding the bond necessary to consummate the sale of the grandson's interest in the Maplewood property. Pollack said to plaintiff's mother when she accosted him, "Will you turn this money over to Mr. Moll if he goes on your bond, and you can draw from it as he cares to pay?" According to the context, this seems to have been said to her by Pollack without previous consultation with Moll. Furthermore, the history of the case shows that Moll was sojourning at Pollack's home at the time the will was written and executed. Moll was then physically and mentally weak. While in this condition, about two weeks before the will was executed, plaintiff accompanied his mother to Pollack's home to visit his grandfather. Moll greeted them, stating that he was suffering the tortures of hell, and began to cry when Pollack, who was at home and who, we may infer, knew of their coming, in the presence of Moll, so the testimony most favorable to plaintiff runs, said to plaintiff's mother, "Mr. Moll doesn't intend to give you any more money. You went and sold that property in Maplewood and settled with the United Railways Company and have plenty of money. You take it and use

it for the support of that child, and when that is through, you come to me and I will see that the old man takes care of the child." And he says, "Who is that man you are living with that poses as Edwin Moll?" And when he said, "Why did you marry Ed Moll, a syphilitic, only to get the old man's money? You know good and well he is not the father of your child. Who are the women you are living with? You are running an assignation house. Go and get out of my house." These were instances, if true, and we must consider them true as the jury so found, in which Pollack assumed and actually exercised dominion and control over the affairs, mind and will power of Moll. In the latter instance, we find no protest from Moll, and it results that the foregoing were circumstances countenancing the inference that Pollack exercised control over Moll at other times, and more particularly in the execution of the will. That Moll later protested to some of his nephews and nieces, relative to Pollack's statements, saying that, if he had been a woman as was Maud, he would have obtained a gun and killed him, and that he did not believe plaintiff was illegitimate, may be construed to the effect that Moll was mentally so afraid of Pollack that he was subject to his dominion. Because of the confidential relation, there was a never-shifting burden of proof on defendants to establish that the will was executed freely and without such influence, even though the burden of evidence may be said to shift to plaintiff upon proof that Pollack followed the suggestions and orders of Moll, for, when plaintiff adduced evidence tending to show an influence unduly used, as was done in this case, an issue of fact arose for the determination of the jury. The trial court did not err in submitting to the jury the question of undue influence. [Fowler v. Fowler, 2 S. W. (2d) 707; Morris v. Morris, No. 26,414, not yet reported.]

IV. Defendants further contend that the record fails to develop evidence of fraud. Their position is grounded on the hypothesis that the record conclusively shows that Moll did not rely upon the statement of Pollack that his grandson was illegitimate. To suport their position, defendants refer to the testimony of Maud Harden that Moll had no doubt that Fred was his grandson; to that of Alice Moll, who said she believed the child legitimate, and Uncle Fred thought so, too; to that of witnesses King and Dixon, employees of Moll on the St. Clair farm, who heard testator speak of his grandson; to that of Roy Courtney, who heard Moll refer to Mrs. Hickey's assertion to him that Fred was not his grandson, Moll saying to Courtney, he would look out for him, no matter what they said. To which may be added the testimony of Pollack, relative to Moll having him take steps to silence rumors circulated concerning the boy's paternity. The testimony of others tended to

show that Moll spoke of the boy as his grandson, on one occasion saying to Mrs. Hickey, ''I know that is my grandson. I am sure that is my grandson,''·and to the solemn pronouncement of the will, in which the boy Fred is mentioned as his grandson.

While this evidence has probative force and would clearly have supported a verdict for defendants on the issue of fraud, on the ground that the testator did not rely upon the statements, yet there is evidence in the record tending to show that false and fraudulent statements as to the boy's legitimacy were made by Pollack to testator. Testator at this time was old and weak, mentally and physically, and afflicted with senile debility, and therefore the subject of easy influence. The natural object of his bounty was his grandson, the legitimacy of whom Pollack does not attempt to deny in this cause. We think it may readily be inferred from the situation developed by the evidence that Pollack would not have given way to such a ·tirade of abuse toward plaintiff's mother in the presence of Moll, as took· place around January 28, 1921, unless such facts had been theretofore discussed with the testator. While testator, after he left Pollack's home and his influence, seemed to resent the statements of Pollack, for seemingly the legitimacy of his grandson was of the utmost concern to him, yet the evidence supports an inference that, while at the home of Pollack and under his influence, the statements created such a grave doubt in his mind as to the boy's legitimacy as to cause him to act upon them in making the will. We think the evidence authorized the submission of the issue of fraud to the jury.

V. Defendants charge that plaintiff's Instruction 1 on testamentary capacity is erroneous, because the petition is predicated on mental incapacity brought about by worry caused by fraudulent and false statements made by Pollack. We find in the petition what is to be construed as a general charge that Frederick Moll was of unsound mind and incapable of making a legal will. Even if we could say that this general charge refers to fraudulent and false statements by Pollack, yet it may be construed as a general averment, and, as this is so, all doubt as to interpretation must be resolved in favor of the pleader. In view of this conclusion, it is evident that the instruction does not extend beyond the pleadings.

VI. Defendants complain of plaintiff's Instruction 2 as improper, because, after correctly defining the term ''preponderance of evidence'' as being the greater weight of the credible testimony, it authorizes a verdict upon a consideration of all the evidence, credible or otherwise. This instruction follows *in haec verba* the instruction found in Naylor v. McRuer, 248

Mo. 423, l. c. 465, 154 S. W. 772. In that case the objector failed to disclose any reason for attacking it. "Credible" signifies capable of being believed. The words "if the jury are not so satisfied" refer and qualify the greater weight of the credible testimony, as used in the instruction, so that, as transposed, it reads: "And if from a consideration of all the evidence the jury are so satisfied by a preponderance or greater weight of the credible evidence that Frederick Moll was not of sound mind, then they will find a verdict for plaintiff." Thus the word "so," preceding "satisfied," refers to a preponderance of the evidence, and that term is defined to mean the greater weight of the credible evidence. The instruction was not erroneous.

VII. Defendants contend that Instruction 3 is broader than the pleadings. This instruction permitted the jury to find that the mind of testator was from disease, age, decrepitude, bodily or mental decay, or other cause or causes, subject to the undue dominion and control of Phillip Pollack. The words "other cause or causes" are denounced on the ground that they afforded the jury the chance to accept, as evidence, certain hints contained in the cross-examination by plaintiff of May Hickey to the effect that testator feared Pollack, because of knowledge on Pollack's part that testator had rectified whiskey, and Pollack had threatened him with Federal prosecution. The question asked by plaintiff's counsel was whether she had told Mr. Young, of counsel for plaintiff, these matters. The witness denied such a conversation. Defendants permitted the question to be asked without objection, and, even if it was improper, which we do not decide, the answer unqualifiedly denied the matter, resulting that there was no evidence before the jury of such a threat or control by Pollack for that reason. We do not think the jury were misled in any manner. Moreover, from the context of the instruction, we think the words "other cause or causes" in this connection refer to a weakened condition of the body or mind of the testator.

VIII. Defendants complain of Instruction 4, or rather that part of it reading: "And you are instructed that whenever through weakness, ignorance, dependence or implicit reliance, of one on the good faith of another, the latter obtains an ascendency which is used to prevent the former from exercising an unbiased judgment, undue influence exists." Defendants charge that the pleadings make the issue the undue influence of Pollack, and that the instruction does not so limit it, but permits the jury to say that, if the testator was biased from any influence or by any person other than Pollack, un-

due influence obtained. By Instruction 3 the jury were limited to an undue influence exercised by Pollack. Instruction 4 defined and amplified the term "undue influence" as used in Instruction 3, thus referring to the undue influence of Pollack. The instructions do not speak of any other influence over the testator than that of Pollack. We think the jury were fully aware by Instructions 3, 6, 7 and 8 that they were limited to a consideration of Pollack's undue influence over testator. Instruction 4 merely defines undue influence. Taken in connection with the other instructions, we do not think the jury were misled, but that they fully understood that the issue was an influence by Pollack over testator unduly used.

IX. Instruction 5 informs the jury in substance that direct evidence of undue influence is not required; that it may be shown by facts from which an inference may be drawn; that proof of undue  influence may be made by evidence of facts from which the inference of the existence of such undue influence may naturally and reasonably be drawn, and if you believe, from the evidence, that any fact or facts are proved from which the inference may be fairly and reasonably drawn that the alleged will of Frederick Moll was procured by undue influence, operating upon him at the time of the execution of the said alleged will, then and in that case it is your duty to find that such alleged will is not the will of said Moll. The criticism leveled at the instruction is, first, that it permits the jury to find undue influence from any fact or facts without requiring them to consider all the facts; second, that it compels them to find for contestant if there is any fact from which undue influence arises; and, third, it fails to limit the jury to the undue influence exercised by Pollack. What we have said in the preceding paragraph disposes of the criticism as to the undue influence exercised by Pollack. While this instruction is inartificially drawn, we do not think it constitutes prejudicial error. The jury were told in effect by the instruction to consider all the evidence, and if from it they found any fact from which a fair and reasonable inference could be drawn that the will was procured by undue influence operating upon him, then they were to find that it was not his will. It was within the province of the jury to determine and to find such fact, if so advised, the finding thereof being left to their discretion. In effect, it was left to them to say whether the testator was unduly influenced, and, as the cause was tried on the theory, both by the evidence and the instructions, that Pollack unduly influenced him, that theory was within the pleadings. We do not think the jury were misled.

X. Instruction 6 places the burden of proof as to undue influence on defendants, because of the confidential relation of attorney and client between Pollack and testator. It then provides that, if Pollack possessed great influence over Moll, and by reason of that influence procured the making of the will, and that he and members of his family received large benefits under the will to the exclusion of those naturally entitled to his bounty, the will was void for undue influence. The instruction is attacked as misleading because it failed to define the term "those naturally entitled to his bounty." In the instruction offered by defendants and given by the court to the jury, the same expression was used. Even if it was necessary to define the expression, which we do not decide, the use of the same expression by defendants without defining it invited the alleged error.

XI. Instruction 7 states that the relation of attorney and client between testator and Pollack is admitted by the pleadings, and that such relations are confidential. The instruction then provides that, if Pollack drew the will, acting as attorney, and that he and his family received large benefits, then the law casts on defendants the burden of showing to the reasonable satisfaction of the jury that such will was not induced by coercion or fraud on Pollack's part, directly or indirectly. Criticism is directed to the words "directly or indirectly," because they permit the jury too wide a latitude. It is also directed to a failure to define "fraud." Further error is predicated because the jury is not limited by the instruction to the consideration of a specific fraudulent act or acts put in issue by the pleadings. The words "directly or indirectly" refer to direct and circumstantial evidence, both of which the jury of right could consider in determining undue influence. The word "fraud" we do not think needs defining, for it is a word of common usage, well understood by the laity. The instruction sufficiently limited the jury's consideration to such fraudulent act or acts as were put in issue by the pleadings. If there were a defect in this regard, it was cured by defendants' instruction which informed the jury that if Pollack did not exercise fraud or undue influence over the testator, they must find for the will.

XII. Instruction 8 is as follows: "The jury are instructed that when a will is made in favor of one's legal adviser, or members of his immediate family, to the total or partial exclusion of the natural heir, the burden is on defendant to show that the will was not obtained by undue influence, and it devolves upon them to show that no such influence was exerted directly or indirectly over the mind of the tes-

tator at the time of the execution of the instrument.'' What we have said in the preceding paragraph as to the words ''directly or indirectly'' is applicable here. Furthermore, what we have heretofore said regarding the question of the instruction limiting the influence, as defined by the pleadings, to the undue influence of Pollack is also applicable. The instruction as a whole limited the undue influence exerted over the testator to that of Pollack, which we think was fully understood by the jury.

XIII. Defendants complain of the refusal of the court to give an instruction offered by them defining the term ''undue influence.'' We need not decide whether this instruction was in proper form, because Instruction 4, offered by plaintiff and given by the court, fully defined the term. It is not error to refuse an instruction even though proper, where the matter is covered by an instruction given to the jury by the court.

XIV. Defendants charge the court erred in refusing their Instruction H. The instruction provides in substance that, even though Pollack reported to Moll words or acts of his grandson's mother of an uncomplimentary nature, or that Fred Moll was not his grandson, or statements concerning the chastity or morality of his daughter-in-law, or as to her feelings or that of his relations to him, such findings, alone, will not justify a denial of the will on ground of fraud or the grounds of fraud and undue influence combined; that in order to warrant a verdict against the will, based on such alleged words or acts reported by Pollack to Moll, the jury were required to find that he did in fact report such words and acts to Moll, and in addition they must find that the same were false and that Moll believed them to be true and that he relied and acted on his belief in their truth when he made the will in dispute. This instruction, as asked, failed to take into consideration the confidential relation of attorney and client existing between Pollack and Moll in the preparation of the will, wherein the burden of proof to show no undue influence was cast on defendants, and its tendency was to destroy the presumption that the will was the result of undue influence, arising from the fiduciary relationship created by Pollack, acting as attorney in the preparation of the will. The court did not err in refusing this instruction.

XV. Defendants further argue that the issues of testamentary capacity and undue influence submitted in this case to the jury are inherently inconsistent. They maintain that, while the courts refuse to sustain motions to elect before trial on the ground that the issues are not then so inconsistent as to warrant sustention, yet in practically all the reported cases the

courts have limited the issues by instruction to one or the other theory. We are unable to agree to the contention. The cases in which the courts have refused to submit one or the other issue are those in which the plaintiff failed to adduce evidence to support the issue. Although there is some authority to the contrary, we see no inconsistency on principle or precedent in submitting the issues of testamentary capacity and undue influence to the jury where the facts justify the theories.

XVI. Defendants contend that the court erred in admitting evidence of statements purported to have been made by testator, relative to making a will in January, 1922, about a year after the will in controversy was executed. While this may not be evidence sufficient to show the statement made was true, yet it was evidence of the manifestation of testator's mental condition. It may have been of slight probative value only, yet it was admissible for that purpose. [Van Raalte v. Graff, 253 S. W. 220; Coldwell v. Coldwell, 228 S. W. 95.]

XVII. Defendants further contend that the court erred in refusing to permit them to show by cross-examination of Alice Moll the effect the breaking of the will would have relative to a legacy bequeathed her son. This line of examination was improper, for the issues did not involve her understanding of the effect of breaking the will.

XVIII. Defendants complain of the admission of the following evidence:

"Q. Shortly after the will was probated, did you have a talk with Mr. Pollack, in which Mr. Pollack stated that he, Pollack, had the dope on Mrs. Harden which would prove that Freddie was not her son? Witness: That question came up.

"Q. Did he say that to you? A. Yes, sir, he did."

Even if this bit of testimony failed to impeach an alleged statement of Pollack, or was not admissible because occurring after the execution of the will and the death of the testator, which we need not decide, it was merely corroborative of other evidence to the same effect, and was therefore plainly not prejudicial.

XIX. Defendants complain that the attorney for plaintiff, in his argument to the jury, erroneously said: "Miss Nordman said that she heard Mr. Pollack tell Mrs. Hickey that that was not the grandson of Mr. Moll." This assignment is untenable for many reasons, principally because the argument of counsel is not preserved in the bill of exceptions and

because the alleged error is not preserved in the motion for a new trial. The statement in a brief that certain argument occurred does not of itself show that it occurred.

XX. Defendants complain of the misconduct of plaintiff's attorneys during the trial. They sum up their complaint by stating that counsel continually and repeatedly asked questions that counsel could not but know were irrelevant, incompetent and immaterial; the making of unfavorable and slurring comments on the evidence; the misquoting of answers; nagging at witnesses in order to egg them on to say or do something that might cause the jury to disregard their testimony. All this being done for the purpose of injecting into the minds of the jury, by way of questions put to the witnesses, matters that could not be properly brought out by answers; to give distorted interpretations and constructions to the answers of the witnesses; to bulldoze and terrorize the witnesses.

Defendants refer to occurrences of alleged misconduct in regard to twelve witnesses, detailing the pages of the record, which we have examined, and in every instance, save one where no objection was made, the trial court sustained the objection as made. On motion for a new trial this assignment of error was presented to the trial court, resulting in a ruling against defendants. The objections as made were proper and were properly sustained by the trial court, for the questions called for incompetent, immaterial and irrelevant matter. The occurrences, however, happened during the heat of the trial and were to some extent the result of an oblivious memory and equivocal answers on the part of Pollack. The sustention of a motion for a new trial for misconduct on the part of counsel is a matter peculiarly within the province of the trial court, resulting that we must defer to its discretion, unless an abuse thereof clearly appears. In this instance an abuse of it does not appear, and consequently we defer to the ruling made below. A similar situation arose relative to an improper argument to the jury in the case of Irons v. American Railway Express Co., 318 Mo. 318, 300 S. W. 283, and we there held that it was primarily a question for the determination of the trial court. There is a distinction between that case and this case as to the situation presented, but the rule still obtains, as to the charge of misconduct of counsel, that it is primarily a question to be considered by the trial court, whose ruling thereon we will not disturb unless an abuse of discretion clearly appears.

Finding no error in the record, the judgment is affirmed. *Higbee* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.