**Merlie Oliver BRUG, Appellant,**

v.

**MANUFACTURERS BANK & TRUST COMPANY, a Corporation, Executor of the Last Will and Testament of Irene B. Hoffman, a/k/a Irene Hoffman, a/k/a Irene Bickerton, a/k/a Catherine Hacke, Deceased, et al., Respondents.**

**No. 54250.**

Supreme Court of Missouri, En Banc.

Dec. 14, 1970.

Lyng & MacLeod, Hyman G. Stein and Charles Alan Seigel, St. Louis, for plaintiff-appellant.

R. H. McRoberts, Jr., James A. Pudlowski, St. Louis, for defendants-respondents.

HOUSER, Commissioner.

■ Merlie Oliver Brug, only child of Irene B. Hoffman, deceased, brought this action to contest the will of her mother. Testatrix was survived by her husband, Oliver Hoffman; her daughter Merlie Oliver Brug, the contestant; her three adult grandchildren (the daughters and son of Merlie Oliver Brug), and her six minor great-grandchildren (the grandchildren of Merlie Oliver Brug). A jury decided the case against contestant and sustained the validity of the will dated February 16, 1966. Contestant has appealed. We have jurisdiction since the will devises real estate, and the estate was appraised at a sum in excess of one million dollars. Houghton v. Jones, Mo.Sup., 418 S.W.2d 32 [1].

A motion to dismiss the appeal for violation of the rules of this court, considered, is not of sufficient merit to warrant the action requested and accordingly is overruled.

The only point properly preserved for appellate review is that the court erred in permitting proponents to read in evidence the statute of descent and distribution, § 474.010, RSMo 1959, V.A.M.S.,[1] and in admitting in evidence for the jury's consideration the statute relating to an election by a surviving spouse to take against a will, § 474.160, RSMo 1959, V.A. M.S.[2]

Appellant contends that the statutes pertaining to the devolution of property in event of intestacy and the effect of a surviving spouse's election to take against a will were irrelevant and immaterial on the sole issue for the determination of the jury, which in this type of action, under § 473.083, RSMo 1959, V.A.M.S., is " * * * whether the writing produced is the will of the testator or not * * *." Appellant argues that it was no proper concern of the jury where the property would go if the will was set aside and that by permitting the introduction in evidence of these statutes the jurors were erroneously authorized to return a verdict based upon matters improper for their consideration; that by placing before the jury the fact that under the intestacy statute the entire estate would go in equal shares to testatrix' surviving only child and surviving husband to the exclusion of the grandchildren and great-grandchildren, proponents were enabled to argue to the prejudice of contestant that the jury should sustain the will in order to permit "the youngsters" to take under it, but that if the will were set aside they might get nothing.

The will of February 16, 1966 left $1,000 bequests to each of four charitable organizations and the real estate at 4245 Oregon Avenue, in which testatrix held an undivided interest, to her daughter, the contestant, if testatrix' husband predeceased her. It left the remainder of testatrix' property in trust with directions to pay the net income of property located at

---

1. "All property as to which any decedent dies intestate shall descend and be distributed, subject to the payment of claims, as follows:

(1) The surviving spouse shall receive:

(a) One-half thereof if the intestate is survived by issue, * * *.

(2) The one-half not distributable to the surviving spouse, * * * shall descend and be distributed as follows:

(a) To his children, or their descendants, in equal parts; * * *."

2. "1. When a married person dies testate as to any part of his estate, a right of election is given to the surviving spouse solely under the limitations and conditions herein stated:

(1) * * * [I]f there are lineal descendants of the testator, the surviving spouse shall receive one-third of the estate, subject to the payment of claims; * * *"

601–611 Sappington Barracks Road to her husband, Oliver Hoffman, for life or until his remarriage, in either of which events the net income was to be paid to testatrix' surviving great-grandchildren. A 3-acre tract was to be held for the benefit of testatrix' great-grandson Arthur Oliver, Jr. One-half the net income from property on South Fourth Street was to be paid to testatrix' husband, the remaining one-half equally to testatrix' daughter, the contestant, and any children of her daughter living at the time of her death. The net income from the balance of her property was to be paid to testatrix' daughter, the contestant, and to each of testatrix' grandchildren living at the time of her death, at the rate of $100 monthly to each of them for life. All undistributed income was to be added to principal, and upon the death of any income beneficiary his or her interest was to terminate. Upon the death of the last survivor of the income beneficiaries all of the property was to be paid over to such persons and organizations as the last survivor by will might appoint (except that the survivor's estate or creditors could not be so appointed), and if the power was not exercised at the death of the last surviving income beneficiary the corpus was to go to his or her heirs-at-law. The will also provided that $5000 be paid to any great-grandchild who graduated from an accredited 4-year college; $5000 on the first marriage of any great-grandchild, and $5000 was to be loaned to any great-grandchild who desired to actively engage in business.

Testatrix died on February 24, 1966, at age 75. Among other things she owned a tavern and hotel property. For many years she operated the tavern and leased the hotel property. Frugal and successful in business and investments, she accumulated an estate during her lifetime having an inventory value in excess of one million dollars. The will contested was executed in a hospital on February 16, 1966, eight days before her demise. A previous will (her first attempt to make a testa-

mentary disposition of her property) was executed on July 8, 1965. The surviving spouse, Oliver Hoffman, formally renounced the will.

For proponents the witnesses to the wills testified that testatrix was of sound and disposing mind and memory and knew that she was disposing of her estate and what she was doing. The attorney who prepared both wills testified that each provision of the first will was explained to her; that she indicated that she was satisfied with it and wished to sign it; that thereafter she wanted it changed; that after several telephone calls with decedent respecting desired changes he prepared a new will, which was mailed to her in December, 1965; that after she entered the hospital in February, 1966 she called for him to come to the hospital and bring the will to be signed; that on February 16, 1966 he spent 50 minutes with her reviewing the second will item by item, after which she executed it.

Contestant's case consisted of evidence of testatrix' continually worsening loss of memory and forgetfulness beginning prior to 1965; inattention to what was being said to her; inability to concentrate on a particular subject; deafness in one ear; limited education; frugality; her physical condition of generalized arteriosclerosis, accelerated degeneration, senility, sedation during her stay in the hospital, inability to comphehend or retain statements made to her; that from February 14 when she entered the hospital until February 24 when she died testatrix "progressively went down hill"; that she was not of sound and disposing mind and memory either on July 8, 1965 or February 16, 1966.

In rebuttal proponents offered the testimony of members of the family who noticed nothing unusual about testatrix and considered her to be of sound mind; a bank president, a real estate and insurance man and an accountant, all of whom noted no forgetfulness on her part, and

had no reason to doubt the soundness of her mind. In rebuttal proponents also offered and the court received in evidence §§ 474.010[1] and 474.160[2] of the statutes of this state.

■ The admission of the statute of descent and distribution and the statute relating to the result of electing to take against the will constituted reversible error. The sole and only issue in this will contest was devisavit vel non—whether the paper writing of February 16, 1966 was or was not the last will of testatrix and if not whether the paper writing of July 8, 1965 was her last will; whether she had sufficient mental capacity to understand and appreciate what she was doing in signing them; whether she was possessed of a sound and disposing mind and memory at the times when these writings were executed. The reading of § 474.010 to the jury, by which the jury was informed that absent a will contestant would receive one-half of this million dollar estate; that her husband would receive the other half, that testatrix' grandchildren and great-grandchildren would receive nothing, and the reading of § 474.160 to the jury, by which the jury was told that by renouncing the will testatrix' surviving husband would receive one-third of the estate, constituted no guide, direction, data or information calculated to assist the jury in any way in the determination of the only issue which this jury was empanelled to resolve. From the record in this will contest it is abundantly clear that the extent or percentage share of the interest of this plaintiff was not in issue and was of no importance; that no pleading raised any issue as to the amount or share of the estate that would go to plaintiff if she prevailed. The only proper question for this jury to determine was whether the will should be set aside on the ground of mental incapacity. If the will should be set aside the determination of how the estate would be

divided was a matter for the consideration and determination of another court in another proceeding. The information given the jurors by admitting these statutes invited them to consider extraneous matters which were not in issue, thus diverting and distracting their attention from and preventing them from giving dispassionate and unbiased consideration to the only genuine issue in the case. The jurors were thereby impliedly if not expressly invited to stand in judgment upon the wisdom and propriety of testatrix' directions by will as to the division and allocation of her property as compared with the statutory devolution of property prescribed by the Legislature. Knowledge of these statutes presented the jurors with the necessity of deciding whether testatrix' daughter and surviving spouse should take all of the million dollar estate or share it with the other lineal descendants under the provisions of the will. The daughter, this contestant, was a tavern and restaurant operator. For 23 years she worked in the kitchen, behind the bar and waited on tables. At the time of her mother's death contestant was living with her third husband. Testatrix' restrained interest in and affection for this, her only, child was pointedly revealed by the mother's provision for her of a monthly stipend of only $100 out of a million dollar estate (placing testatrix' daughter on a parity with her nine grandchildren and great-grandchildren). Testatrix left her surviving spouse, a stranger to the blood, nothing but a life interest in the income from one property. By admitting the statutes in evidence the jury was informed that if the will should be set aside these two would receive the entire million dollar estate to the exclusion of the grandchildren and great-grandchildren of testatrix, who would receive nothing if the will were broken. On the other hand, by upholding the will the grandchildren and great-grandchildren would be assured

not only of receiving $100 a month for life, $5000 on graduation from college, $5000 on marriage, and loans of $5000 if they wished to actively engage in business, but the last surviving income beneficiary (who in the normal course of events would be one of the great-grandchildren) would receive a power of appointment as to the entire remaining estate. That estate would be quite substantial because the modest-sized bequests would not consume the income from this large estate, and undistributed income was to be added to principal. Placing these statutes before the jury enabled proponents to make an appealing in terrorem argument on behalf of the grandchildren and great-grandchildren that under the statutes contestant and Mr. Hoffman would take the entire estate; that contestant might place her half of the estate in the hands of her present husband, or a future fourth husband or dissipate the fortune to the complete exclusion of the children from any participation in its benefits.[3]

Research of counsel and court reveals no direct Missouri ruling on this question. The closest approach is the ruling in Moll v. Pollack, 319 Mo. 744, 8 S.W.2d 38, 48, that it was not error to refuse to permit cross-examination to show the effect the breaking of the will would have upon a legacy bequeathed to a son. The court said, "This line of examination was improper, for the issues did not involve her understanding of the effect of breaking the will." 8 S.W.2d, l. c. 48 [20]. Looking elsewhere, the Supreme Court of Nebraska in In Re Abts' Estate, 122 Neb. 714, 241 N.W. 270, held it reversible error in a will contest involving issues of mental capacity and undue influence to instruct the jury that in the absence of a will a widow without children "inherits one-half of the estate left by her husband in addition to certain allowances and specific property" and that if a husband in such a case leaves a will the widow is entitled to elect to take a statutory share if she is not satisfied with the share given her by the will. The court could not see how this could act as a guide or assist the jury in determining the question of mental capacity or undue influence submitted to them. The first instruction " * * * constituted something of an invitation for the jury to substitute their own judgment for the will of the testator as to what would be a proper disposition of testator's property, in view of what

3. Counsel argued that if there was no will contestant would get half and Mr. Hoffman would get the other half of the estate. Stating that he was "worried about the * * * youngsters," he made it plain that under the will the youngsters would be assured of getting $460,000 over a period of some 70 years, but that they were not assured that Mrs. Brug would give them a penny. He stated: "If you award this money to her, she could take it back and get the money in her name and her husband's name and those children don't have one right to one penny of it. The wisdom of that woman, Irene B. Hoffman, is the thing you have got to consider. She understood it; she knew if she gave all of that money to her daughter the grandchildren and great-grandchildren wouldn't get a penny. She had the wisdom to see to that—much better business acumen than I have—to see that each of these youngsters are taken care of. * * * This woman, Irene B. Hoffman, had the wisdom, she knew there was a lot of money. She knew her daughter, Mrs. Brug, a tavern operator, she knew though she couldn't handle that money. Oh, sure, she can handle the nickels and dimes that come across the bar but not the million dollars we have got in this estate. So, I am asking you, Ladies and Gentlemen, you remember these youngsters, what they got. We are not here to destroy a will. Those of you who have wills, you don't want to know that any time, with the drop of a hat, somebody can walk in and change your will. This woman provided for every one of these youngsters and every one of the grandchildren and great-grandchildren, also Mrs. Brug. Mrs. Brug, she has been married three times and there is no reason why she couldn't be married the fourth time. Are you going to leave that money to her? Talk about strangers! That money could be left to somebody else all right, it could be left to the third or fourth husband of Mrs. Brug. * * *"

the law would give the widow if no will was made." The second instruction was criticized, partly on the ground that the jury were left to weigh the provisions made by the will with the provisions made by law, "and then determine whether she should have been satisfied. It would seem clear that this instruction suggested the consideration by the jury of matters that were not an issue in the case." 241 N.W., l. c. 272. In Tucker v. Houston, 216 Ala. 43, 112 So. 360, the Supreme Court of Alabama held that it was not error in a will contest to refuse an instruction that if a verdict was found for contestants the heirs at law of testatrix would take equally and share alike of her property, because "[i]t was no concern of the jury what became of the property of testatrix in the event the will was set aside." 112 So., l. c. 364 [20]. In Crocker's Heirs v. Crocker's Heirs, 156 Ark. 309, 246 S.W. 6, the Supreme Court of Arkansas held that it was not error in a contest to refuse an instruction advising the jury what disposition would be made of testator's property if the will was not upheld. The court said, "No error was committed in this respect, as the very purpose of the will, if there was one, was to change the order of the devolution of the property—a fact which the jury, of course, knew—and the jury should have decided whether there was a will without any consideration of the equities of the case. If Crocker had the testamentary capacity to make a will—and that was the question submitted to the jury —then it was no concern of theirs that the testator had, by his will, given property to his wife which, upon her death, went to her heirs which, without the will, would have gone to his heirs." 246 S.W., l. c. 9 [5]. In Kindel v. Kindel, 57 S.W. 2d 223, the Court of Civil Appeals of Texas held that it was error to tell the jury in a case involving the contest of a will what the law would give proponents in the event the jury found for contestants. In Bell v. Bell, 248 S.W.2d 978, in a suit to set aside a will on the ground that testator lacked mental capacity to execute

the will the Court of Civil Appeals of Texas held that it was improper for counsel to tell the jury that he and his clients wanted the will set aside and the property to pass according to the law of descent and distribution, and then to tell the jury how the property would be divided in that event.

■ Proponents claim that contestant failed to preserve any objection to the reading of these statutes. While he did not use the word "object" when proponents sought to read them to the jury counsel for contestant said, "it is irrelevant and immaterial to any issue in this case. * * As to what she would take is irrelevant. The question is: Is this the last will and testament of the deceased." The court, treating the statement of counsel as an objection, said "Objection overruled." Contestant's counsel sufficiently made known to the court the action which he desired the court to take and his grounds therefor, within the requirements of Civil Rule 79.01, V.A.M.R., and therefore sufficiently preserved his objection to the reading of the statutes. Proponents' further claim that contestant failed to object to proponents' references to these sections in final argument and therefore waived any objection to the argument is without merit for obviously it would have been futile to object to an argument based upon statutes the admissibility of which the court by its previous ruling had already sanctioned, over the objection of contestant. Critcher v. Rudy Fick, Inc., Mo.Sup., 315 S.W.2d 421, 429 [10]; Villinger v. Nighthawk Freight Service, Mo.App., 104 S.W.2d 740, 743 [5].

■ Proponents claim that under § 491.010, RSMo 1959, V.A.M.S. Kunz v. Munzlinger, Mo.Sup., 242 S.W.2d 536, 538, Houfburg v. Kansas City Stock Yards Co. of Maine, Mo.Sup., 283 S.W.2d 539, 549, and Smith v. Davis, 203 Ga. 175, 45 S.E.2d 609, the reading of § 474.010 was proper to show the interest of contestant and could be considered in assessing her credibility.

Under § 473.083, RSMo 1959, V.A.M.S. plaintiff had to be a "person interested in the probate of a will"—a person with a financial interest in the property of the deceased, In Re Ballard's Estate, 362 Mo. 1150, 247 S.W.2d 683, 685 [2]—in order to maintain this suit. "Unless such interest exists, the party cannot contest the will, no matter what his motive." 3 Page on Wills § 26.52, p. 118; In Re Gartside's Estate, 357 Mo. 181, 207 S.W.2d 273 [1]. It is basic that the interest of a party may be shown for the purpose of affecting his credibility, § 491.010, V.A.M.S., and wide latitude is allowed in demonstrating that interest. It was eminently proper to show that contestant was an heir to her mother's estate and thus had a financial interest in the case. In this connection see Harris v. Goggins, Mo.Sup., 374 S.W.2d 6, 16 [15]. (The pecuniary interest of contestant, as an heir, in the outcome of the litigation must have been obvious to all, including the jury, by the very fact that she filed this will contest. Else why would she have filed the action?) The extent, however, to which one party may go in demonstrating the interest of an adverse party is not unlimited. It is largely within the discretion of the trial court and if that discretion is abused to the prejudice of the adverse party the error may be corrected on appeal. It is an abuse of discretion to permit an excursion into the question of interest which reveals information subversive of the purpose and object of the trial, and that is what happened here. Furthermore, as stated in Hungate v. Hudson, 353 Mo. 944, 185 S.W.2d 646, 649, "Immaterial and incompetent evidence may not be got before the jury under the guise that it impeaches or discredits the witness." And see Schroeder v. Rawlings, 344 Mo. 630, 637, 127 S.W.2d 678, 682 [7], and O'Shea v. Opp, 341 Mo. 1042, 111 S.W.2d 40.

■ Proponents claim that the error, if any, in reading §§ 474.160 and 474.010 to the jury was invited error; that in his opening statement contestant's counsel told the jury that for 74 years testatrix had been willing to accept the intestate distribution provided by law and had no will, and in closing argument urged that all contestant wanted was to take by descent and distribution, and that contestant's counsel read to the jury the surviving spouse's election to take against the will, which recited that he "renounced all provisions" of the will. Contestant's theory was that throughout her life her mother had been satisfied to have her property pass as the law provided, but that near the close of her life, after she had deteriorated mentally, a strange lawyer entered her life and wrote up a document which to her was incomprehensible and which did not represent her will. Contestant had a right to have this theory advanced in her opening statement and in so doing did not "open the door" and thereby invite or permit the showing of exactly how the law distributes property absent a will.

■ On retrial Instruction No. 2, which placed the burden of proof upon contestant to show that decedent was not of sound and disposing mind when she executed her will, should not be used. The burden of proof is upon the proponents of a will initially and it remains there at all times during the trial. Houghton v. Jones, Mo.Sup., 418 S.W.2d 32, 39; Foster v. Norman, 346 Mo. 850, 143 S.W.2d 248, 249; Weaver v. Allison, 340 Mo. 815, 102 S.W.2d 884, 885.

Judgment reversed and cause remanded for a new trial.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

Reversed and remanded.

FINCH, SEILER, MORGAN, HOLMAN and BARDGETT, JJ., concur.

HENLEY, C. J., and DONNELLY, J., dissent and adopt dissenting opinion of HIGGINS, C., in Division One, as their dissenting opinion.

HIGGINS, Commissioner (dissenting).

The verdict and judgment that the February 16, 1966, will of Irene B. Hoffman, deceased, is the last will and testament of Mrs. Hoffman should be affirmed because appellant's complaints do not, under the law applicable to the posture of this case, call for a reversal of such solemn findings.

Irene B. Hoffman, age 74, died February 24, 1966, at Incarnate Word Hospital in St. Louis, Missouri. On March 2, 1966, a document dated February 16, 1966, was admitted to probate in the Probate Court of St. Louis County as her last will and testament, and letters testamentary were granted to Manufacturers Bank and Trust Company. On June 16, 1966, Oliver Hoffman, as surviving spouse, elected to take against the will and, on September 19, 1966, testatrix's only child and daughter, Merlie Oliver Brug, filed this will contest.

During her life, Mrs. Hoffman owned a tavern and hotel property on South Fourth Street in St. Louis. For many years she operated the tavern and leased the hotel. She maintained a room at the hotel but her home and residence were in St. Louis County. She was a frugal and shrewd businesswoman and, through investments and business transactions, accumulated personal and real property valued in excess of $1,000,000. During her life she made numerous gifts and accommodations to her daughter and grandchildren by way of education, property, cash, and forgiven loans. She had no will prior to July 8, 1965.

Proponents proved execution of the will in question by the attorney who drafted both documents, Vern H. Schneider, and Louis J. Garr, Jr., an attorney in Mr. Schneider's office; and both witnesses stated the testatrix to be of sound and disposing mind and memory at the time she executed her will February 16, 1966. Mr. Schneider became acquainted with Mrs. Hoffman in June, 1965, when he received a telephone call from her inquiring if he would draw a will for her. They arranged to meet in the lobby of the Manufacturers Bank & Trust Company in which Mrs. Hoffman was a substantial stockholder. They went into a private room at the bank to confer, and Mrs. Hoffman gave Mr. Schneider a typewritten outline with handwritten interlineations of her idea of her will. Discussion led to selection of a trustee to hold her estate in trust for her intended purposes and she selected The St. Louis Union Trust Company in which she was also a stockholder. Mrs. Hoffman subsequently furnished Mr. Schneider with her 1964 income tax return, a list of favored charities, and real estate descriptions. The July 8, 1965, draft was presented to her in a 2-hour conference on that date. Mrs. Hoffman noted her understanding and satisfaction, and executed it with Mr. Schneider, Roger R. Fagerberg, an associate, and Shari Butler, a secretary, as witnesses. Mr. Schneider and Mr. Fagerberg also testified to her sound and disposing mind and memory at this execution.

On November 2, 1965, Mrs. Hoffman obtained a copy of her July 8, 1965, will from Mr. Schneider, after which there were several telephone calls between them respecting changes which resulted in the second will, a copy of which was mailed to Mrs. Hoffman December 27, 1965. Mrs. Hoffman entered the hospital February 15, 1966, and, on February 16, 1966, called Mr. Schneider to come to the hospital with the second will which, after nearly an hour's conference, she executed in the manner previously described.

Contestant's case on lack of testamentary capacity was submitted on her testimony and that of Dr. V. E. Michael, her mother's attending physician, who described Mrs. Hoffman as a patient suffering from arteriosclerosis. In his opinion, Mrs. Hoffman was not of sound and disposing mind and memory on either July 8, 1965, or February 16, 1966. Contestant, a thrice-married woman, had been in the tavern and restaurant business 23 years. She testified that her mother was losing her memory and power of concentration; that her mother was of limited education and had poor com-

mand of the English language; that while in the hospital her mother was in pain and feeble; that she would doze and say very little, a condition present February 16, 1966. She testified also that at no time did her mother tell her that she had executed a will; that with respect to her mother having any particular feeling about people outside her family in connection with her property, "she wanted to hold on to it, or her family to hold on to it." She acknowledged, however, that, at her mother's request, she called Vern Schneider about a will and told him that her mother wanted him to come to the hospital to read a will or something to that effect. She also acknowledged that sizable sums of money were given to her by her mother through the years.

Proponents reassumed their burden and called a number of witnesses in rebuttal of contestant's testimony that her mother had a faulty memory. Such witnesses further supported Mrs. Hoffman's business sense, judgment, disposition, and lack of irregular or unusual behavior.

Understandably, appellant tacitly concedes the sufficiency of this evidence to support the jury's verdict upholding the will but, despite such concession, she would overturn the verdict and judgment sustaining her mother's will on two charges of procedural error. Her first such contention, accepted by Judge Houser as ground for reversal, is that the court erred in permitting proponents to read in evidence Section 474.010, V.A.M.S., on descent and distribution, and Section 474.160, V.A.M.S., authorizing election by surviving spouse to take against the will, and to permit argument "based thereon," because such provisions were irrelevant to the issue of testamentary capacity and therefore prejudicial to appellant's suit.

In this case, absent the will which provided something for all the living natural objects of her bounty, Mrs. Hoffman's property would have devolved one half to contestant and one half to the surviving

spouse; and it is true that the ultimate issue for the jury was whether Mrs. Hoffman was of sound and disposing memory when she made her testamentary provisions which modified this otherwise intestate devolution. However, simple recognition of this proposition does not make resolution of all other fact questions which arose in this case immaterial and irrelevant for they, too, had to be resolved by the jury in deciding the ultimate issue. Judge Houser's opinion demonstrates advocacy much like the argument and strategy of contestant's counsel found without appeal by the jury; and he has stated only that part of the context which supports his view. Consequently, in order to dispose of appellant's contention, it is necessary to state additional circumstances to show all of the trial theories, strategy, and context out of which the purportedly reversible matter arose.

At the outset of trial, the court read M.A.I. 2.01 to the jury which, among other things, told the jury that "in considering the weight and value of the testimony of any witness you may take into consideration * * * the interest of the witness in the outcome of the suit, the relation of the witness to any parties to the suit, * * *." Opening statements were then made on behalf of all parties. On behalf of contestant, Mr. Seigel stated that the jury would see "that for seventy-four years of her life, and up until the time of the signing of these alleged documents * * * she (Mrs. Hoffman) was willing to accept the disposition of her property by the estate laws of the State of Missouri, as provided by our Legislature. But then in 1965 and 1966 there came into her life strangers. Strangers and these two documents * * that are so complex and so lengthy that it would take the most brilliant, skillful lawyer many days to understand."

Proponents adduced testimony from Carole Ann Mauk of the Probate Court of St. Louis County to show the inventory of Mrs. Hoffman's estate, the will of February 16, 1966, and its admission to probate, the grant of letters testamentary to Man-

ufacturers Bank, and the *fact of election* to take against the will of the surviving spouse. From cross-examination of the same witness, contestant secured a reading into evidence of the election: "I, Oliver Hoffman, surviving husband of Irene B. Hoffman * * * do hereby elect to take my legal share in the Estate of the said Irene B. Hoffman, and I do hereby renounce all provisions in the Will of the said Irene B. Hoffman inconsistent herewith."

During her case in chief, contestant testified as previously set forth. After this, and during the proponent's case going forward with the evidence, respondents asked leave to read Section 474.160, V.A. M.S., "Election by surviving spouse to take against will, effect." Mr. Seigel then stated his understanding "there is being offered to be read a section of the Missouri Statutes providing that the husband of the deceased would take one-half of the estate rather than one-third if he had not elected and if the will was set aside. This is in effect a self-serving statement and has a tendency to build up a witness who has not even been here in Court, and it is irrelevant and immaterial to any issue in this case." Proponents' counsel then stated a wish to read Section 474.160, supra, on election and "to read 474.010 which is the distribution section to attempt to show what the plaintiff will take here if she is successful in having this jury find this is not the will; as bearing on her motive and credibility in bringing this suit." Mr. Seigel: "As to what she would take is irrelevant." The court, perhaps gratuitously, treated Mr. Seigel's quoted statements as an objection but, in any event, overruled it after which proponents' counsel read both sections.

Trial proceeded without further incident with respect to appellant's contention until closing arguments. Mr. McRoberts and Mr. Pudlowski, on behalf of proponents, argued first without any mention of descent and distribution, election, renunciation, or the statutes or their effect as circumstances in their case. Mr. Seigel, on behalf of contestant, argued next: "* * * I think

you will find there is no possibility that this woman, in her state of mind, could have ever understood these documents. I think you will find that Mrs. Brug, who is the head of the household will take care of these children, who are her children and her grandchildren. * * * *I think you will find the property will go as provided for by the Legislature in the natural way and as is provided in the same way in almost every state. And that is the way the property should go. That is the way for some seventy years the deceased wanted her property to go.* And it was only when she was old * * * did the trust company come into the picture * * *." Next, also on behalf of contestant, was Mr. Mac Leod: "* * * *All of this was not her will and I would say the best proof of it is that her husband renounced the will right off the bat, yet all the evidence will point to the fact that she was close to him.* There is nothing in this family that indicates real antagonism, yet the husband was left a pittance like her own child. * * * And *he did not waste a moment, he renounced the will which under the law he has the right to do* * * *. Now, all we are asking is not that this money be turned over to Mrs. Brug. This is not that type of lawsuit. This is to determine whether these wills were made by a person of sound mind. If they are not, then of course they come under the laws of descent and distribution. * * * *Let the laws of the State of Missouri determine the descent and distribution of this money,* not a person who did not know, and obviously did not know, and the man who wrote the will knew she did not know, what she was doing * * *."

Next was Mr. McRoberts again, followed by Mr. Pudlowski who, *for the first time* on behalf of proponents *and without objection,* made the argument now for the first time in question: "They said, 'Don't worry about the children. This money is not going to be given to her.' Well, certainly, if there is no will she gets half and Mr. Hoffman gets the other half. They say, 'Don't worry about the children.' Well, I am

worried about Arthur Oliver and I am worried about the four youngsters. When you get back to the jury room figure out what they will get over a period of some seventy years; you will find they will get over $460,000.00. They are assured of that. And they are not assured that Mrs. Brug is going to give them a penny. If you award this money to her, she could take it back and get the money in her name and her husband's name and those children don't have one right to one penny of it. The wisdom of that woman, Irene B. Hoffman, is the thing you have got to consider. She understood that; she knew if she gave all of that money to her daughter the grandchildren and great-grandchildren wouldn't get a penny. * * * She knew her daughter, Mrs. Brug, a tavern operator, she knew though she couldn't handle that money. * * * So, I am asking you, Ladies and Gentlemen, you remember these youngsters, what they got. We are not here to destroy a will. Those of you who have wills, you don't want to know that anytime, with the drop of a hat, somebody can walk in and change your will. This woman provided for every one of these youngsters and every one of the grandchildren and great-grandchildren, also Mrs. Brug. * * * There has not been anything to show that this woman was of unsound mind."

The first, and obvious, difficulty with appellant's position in her first contention is that there was no mention by Mr. Pudlowski of the statutes in question. The second, and equally obvious, difficulty is that there was no objection to proponents' final argument. Such was the first mention of descent and distribution by proponents and it came in obvious answer and retaliation to contestant's argument where the law and effect of descent and distribution and the widower's election to take against the will were urged as reasons for overthrowing Mrs. Hoffman's last will and testament and letting legislative wisdom dispose of her property. The argument has been set forth in some detail because it shows not only the posture of the arguments and absence of objection by appellant but

also demonstrates absence of excuse for failure to object in that counsel had just argued his own version of the effect the jury should give those propositions in reaching its verdict, the same effect he injected in his opening statement. Under Civil Rule 79.03, V.A.M.R., the general rule, applicable to these circumstances, is that when no objection is made to asserted improper argument, it is not a matter subject to review on appeal. The theory is that the allegedly erroneous feature is waived. Olsten v. Susman, Mo., 391 S.W.2d 328, 330[3]; Birmingham v. Coen, Mo., 320 S.W.2d 509, 510[2].

With respect to the charged error in permitting the two statutes to be read, the courts have held it improper to read law to the jury but have not ordered reversals on that ground. This is not to suggest that such practice would never result in reversible error, but rather to indicate that cases in which it has occurred have been reviewed on their own circumstances to determine whether the drastic remedy of reversal was required on that account.

In State ex rel. Gehring v. Claudius, 1 Mo.App. 551, counsel read irrelevant matter from the United States Constitution in closing argument. The practice was deemed "improper" but the alleged error was held "harmless." Barnett v. Sweringen, 77 Mo.App. 64, 76, held it was within the discretion of the circuit court to allow counsel to read from a decision of the supreme court to the jury. In Minter v. Bradstreet Co., Mo., 174 Mo. 444, 73 S.W. 668, there was an objection, overruled by the court, that counsel was reading a law book to the jury in argument, of which action the court said: " * * * there are many instances where appellate courts have refused to reverse judgments because the trial court permitted law to be read. The general rule, as announced by the authorities, is that it is a matter resting largely within the discretion of the court, * * * if the judge sees fit to permit this to be done, and the law is correctly laid down in the decision or book used by the counsel, it would not * * * constitute legal error * * *

although such a practice is not to be encouraged." 73 S.W. 1. c. 685. In Lewis v. Barnes, Mo., 220 S.W. 487, counsel read the mandate and opinion of the supreme court in the prior appeal and characterized it to be "clearly error. This is a reprehensible practice, and its tendency, under ordinary circumstances, is to confuse rather than enlighten the jury, who in the due and orderly administration of justice must obtain the law for their guidance from the instructions given by the court. * * * However, appellate courts are loath to reverse upon this ground alone, unless it appears that the jury was thereby misled or there is some other showing of prejudice to the opposite party." 220 S.W. 1. c. 489[4, 5]. The problem and its resolution without reversal was more recently reviewed in Merrick v. Bridgeways, Inc., 362 Mo. 476, 241 S.W.2d 1015, where defendant contended on appeal that the court erred in permitting plaintiff's counsel to read in evidence and for the jury certain Illinois statutes, some of which were inapplicable. The court's observations provide an appropriate guide for denial of appellant's contention in this case. "We are not concerned here with the reading of reported decisions or of lawbooks in general to the jury. (Lewis v. Barnes [supra]; Barnett v. Sweringen [supra].) The court did not set forth any of the statutes in the instructions and leave it to the determination of the jury whether the statutes had been followed * * *, and we are not concerned here with the problem of the court's duty in instructing the jury upon the law. * * * There is no complaint under this allegation of error as to the manner in which the court instructed the jury * * *. The sole complaint here is of the prejudicial effect of the mere reading of the statutes to the jury. * * * The practice of reading statutes to the jury is not to be commended * * *, nevertheless, in the absence of a plain

demonstration of abuse of discretion and prejudicial effect, it has not been held to be reversible error when permitted, and in the circumstances of this case it may not be confidently said that the mere reading of the statutes was so prejudicial as to demand a new trial. Annotation 77 A.L.R. 650, 652 * * *." 241 S.W.2d 1. c. 1018 [5, 6]. See also King v. Furry, Mo.App., 317 S.W.2d 690, where there was no reversible error in permitting plaintiff to secure evidentiary advantage by reading the statute into evidence and the effect of it was otherwise covered by the court's instruction.

Under an application of these precedents and, in particular, the last-quoted authority to the circumstances of this case, it may not be said that the reading of the statutes prejudiced this will contestant as to require a new trial. It will be remembered that the matter of allegedly prejudicial argument by proponents cannot be coupled with the reading for purposes of supporting allegations of prejudice and abuse of discretion because, as demonstrated, there was no objection to proponents' argument. Review of all the circumstances of this case reminds also: that, at the outset and without objection, the jury was instructed that it could consider the interest of any witness, and the instruction applied to contestant testifying in her own behalf as well as to witnesses called by proponents to establish the will and state of mind of the testatrix (see Arnold v. Alton R. Co., Mo., 154 S.W. 2d 58, 62, that "the interest of a witness with respect to the issue on trial is never irrelevant"; and see also Houfburg v. Kansas City Stock Yards Co. of Main, Mo., 283 S.W.2d 539, 549, that "the pecuniary interest of a witness * * * can always be shown" subject only to the sound discretion of the judge; Section 491.010, V.A. M.S.) [1]; that the first mention of dispo-

---

1. And, as stated in Judge Houser's opinion, "it is basic that the interest of a party may be shown for the purposes of affecting his credibility, * * * and wide latitude is allowed in demonstrating

that interest. It was eminently proper to show that contestant was an heir to her mother's estate and thus had a financial interest in the case."

sition of property by laws of descent and distribution was made by counsel for contestant in the opening statement, presumably for advantage to contestant since it was made in her behalf; that the substance of the widower's renunciation of the will, as opposed to the fact of election, was put in evidence by contestant; that only after those developments did proponents seek to read the statutes covering those matters, and reference to the statement of counsel for contestant at that time shows absence of clear expression of an objection; that opening arguments of proponents' counsel made no reference to the statutes or their effect; that closing arguments of contestant's counsel were, in fact, bottomed on the effect of those statutes and were a request that the jury accept them as grounds upon which to overturn the will so that contestant could take care of the property which Mrs. Hoffman had seen fit to bequeath and devise in a different manner; that only after such argument did proponents' counsel argue with respect to matters that were the subject of the statutes. In addition, the statutes are accurate statements of law; there is no contention that the jury was misled by their presence in evidence, and at no time did contestant seek their withdrawal. This last observation is pertinent in view of the position taken by contestant's counsel in opening statement, his weak position at the time of admission of the statutes, and his strong argument to the jury based on the propositions they represented. It is not necessary to speculate what contestant's counsel had in mind in bringing descent and distribution and the widower's election into this case, but presumably he felt it to be to contestant's advantage else he would never have done so; and it is too late now, in retrospect, to claim error on the theory that his opponents secured a greater advantage from the same thing.

Judge Houser's opinion relies on cases from foreign jurisdictions, and his quotations from, and paraphrases of, them demonstrate that they are hardly persuasive generally, much less are they applicable to the specific problem created at least in part by appellant and posed by the context of this case. In such circumstance, and in contrast, the Missouri cases cited in support of this demonstration of nonreversible error are in point and persuasive.

If this view prevailed it would become necessary to dispose of appellant's remaining charge of error in giving Instruction 2 on burden of proof. Appellant has difficulty with this contention also in that there was no objection to the instruction at trial; no such objection as now stated was made to the trial court in the motion for new trial; and appellant concedes that any relief must come through consideration of the allegation as a matter of plain error under Civil Rule 79.04, V.A.M.R.

Under Civil Rules 70.02, 79.03, and 83.13, V.A.M.R., objections to instructions must be presented to the trial court prior to their submission to the jury or in a motion for new trial. When objection is first raised in the brief on appeal, it is too late and the point is not for review. Wiesemann v. Pavlat, Mo.App., 413 S.W.2d 23, 28[9]; Larson v. Alton & S. Ry. Co., Mo.App., 431 S.W.2d 687, 691[3]. With respect to the invitation to review this allegation as a matter of plain error, "it should be interpolated that by its own terms the purpose of the plain error rule is to afford relief against 'manifest injustice or miscarriage of justice,' * * * and it does not relieve 'the litigant from his obvious duty to give the trial court an opportunity to rule.'" Brown v. Boyd, Mo., 422 S.W.2d 639, 642 [3], and see Witherspoon v. Guttierez, Mo., 327 S.W.2d 874, 879–880[4], where alleged unpreserved error in a verdict-directing instruction was held not to have resulted in manifest injustice or miscarriage of justice under the plain error rule.

In this case, where the testatrix made provision for all the natural objects of her bounty, there is no demonstration, and it may not be said, that the court abused its discretion with respect to the arguments and

admission of evidence, or that manifest injustice or miscarriage of justice occurred on account of an unchallenged instruction. The result leaves decedent's provisions intact, is proper, and, accordingly, the judgment to that effect should be affirmed.

WELBORN, C., concurs.