STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Missouri,
Appellant,

v.

Bertie A. OFFUTT et al., Exceptions of Brad-
ford C. Winsborough and Dorothy E.
Winsborough, Respondents.

No. 56105.

Supreme Court of Missouri,
Division No. 2.

Dec. 11, 1972.

Motion for Rehearing or to Transfer to Court
En Banc Denied Jan. 8, 1973.

Robert L. Hyder, Earl H. Schrader, Jr., Frank O. Benson, Kansas City, for appellant.

Sevier & Turnage, Robert F. Sevier, William E. Turnage, Liberty, for respondents.

HENRY I. EAGER, Special Commissioner.

Plaintiff has acquired by condemnation all of the improved portion of a 2.96-acre tract operated as an independent filling station on U.S. 71 By-Pass in Jackson County. The location was in the "Courtney

Bottoms" about 1,000 feet north of the Missouri River bridge. It was agreed that the proceeding would be considered as a complete taking of the tract. The site fronted for 500 feet on the two-way By-Pass, which was being converted into a divided highway. There were no other filling stations for 4–5 miles on either side along the existing highway. The date of taking was April 25, 1969. Defendant Winsborough and his wife owned the tract; they bought it in 1959 for $10,000 and completed the station in December 1960. Mr. Winsborough had been in the filling station business since 1937 and operated and built other stations. The improvements, including building, equipment and grading, cost $56,369.34, making a total cost of $66,369.-34. The station was operated for 24 hours a day with three shifts. The owner bought his gasoline from independent oil companies, largely in Minnesota. American Petrofina Company of Texas was named as a defendant, but it did not appear and the owners stated in their answer that it had no interest. The Collector of Revenue of Jackson County was also named but did not appear. The Commissioners made an award of $80,150 and defendants filed exceptions. The verdict of the jury awarded defendants $95,633 and judgment was entered thereon, requiring also that plaintiff pay interest at 6% from April 9, 1969, on the difference between the awards. Plaintiff duly appealed after its after-trial motion was overruled.

Plaintiff originally raised a point of error on an instruction; this has now been waived and the only question presented concerns the admission of evidence. We shall state that point now, in order that the reader may correlate it with our statement of the evidence. The point is that the Court erred in permitting defendants' expert witnesses to give their opinions of damages based on improper and noncompensable elements, including a loss of business. More specifically, the claim is that the error consisted in letting each expert fix a total "fair market value" by multiplying the average number of gallons pumped per month by a figure which the expert selected for himself and which varied from $1.25 a gallon to $1.50 a gallon, with one fixing the figure at $1.40; thus, they reached totals of $103,000, $135,500, and $165,000, all of which were greatly in excess of the value of the land and improvements, about which there was no real controversy.

Defendant Winsborough testified to the costs as already stated; he described the location and the station, the sixty-foot entrances, the equipment, and the gallonage pumped; the latter (monthly average) was: 1967—88,174 with 5.98% diesel; 1968 —106,546 with 5.99% diesel; 1969 (8 months)—102,507 (diesel not stated). He itemized his costs, and gave his opinion that the total damage was $155,000, stating that he based it upon the number of gallons pumped, and a rental basis of one and one-half cents per gallon per month; also, that the gallonage was worth $1.50 per gallon per month to a purchaser. He gave no basis for these figures, but, of course, an owner is allowed to give his opinion generally on value.

We consider it necessary here to review the evidence of defendants' experts individually because of variances. Jay Davies, identified with the gasoline industry for 25 years, testified: that he had appraised this station for defendants; that in his opinion its value was $103,000, "with the volume of business that it was doing," and that he would have "offered" that amount. On cross-examination he testified that *he* arrived at the figure stated by multiplying the average of 82,000 gallons per month (eliminating diesel fuel and the "price conscious" truck business) by $1.25; that the land was probably worth $25,000, and the total physical property about $52,000; that the difference between $52,000 and $103,000 was based on gallonage, although other factors, such as the ability of the operator, gas wars, credit cards, etc., do enter the picture; that leases are made at one to one and one-half cents per gallon per month, but usually with a monthly minimum; that the difference between $52,000 and $103,000 was

based upon his judgment of being able to continue the gas business that the station was doing, and that if there was not a going business the value would merely be that of the land and improvements; also, that the $103,000 is what he would pay for the volume, i. e., the value of the going business.

Frank D. Miller, in the gasoline and real estate business, and having had some experience in the acquisition of station sites, testified: that the leasing and rental of sites has a relation to their fair market value; that in his opinion the fair market value of this station at the taking was $135,500; that the formula *he uses* is to multiply the average monthly gallonage by $1.50, but that in this case he "shrunk" the figure to $1.40 because the station "does not * * * exactly fit"; that the sole "criteria" is the production of the station, although the ability of the manager may be material. He also stated that there might be a different formula on a Standard Oil station. On cross-examination he testified: that he had leased stations on a per gallon basis but not without a minimum; that $35,000 would be the maximum value of the improvements, with depreciation; that the land was worth $100,000, but this was apparently based on his gallonage or "performance"; that managerial ability, economic conditions, etc., may influence the production, but production is 90% of the value of the station, and that the gallonage is "directly related" to the amount of business done.

Robert H. McKee, who owned and operated service stations and was an officer of an oil company, testified: that his business included the purchase of stations and station locations; that the primary factors to be consideerd are location and gallonage, and that the size of a station is important; that he had been apprised of the cost of this station and the gallonage it produced; that in his opinion its fair market value was in the "neighborhood" of $165,000; that he multiplied the *"annual gallonage"* by

$1.50. On cross-examination he testified: that the location of this station was "very unusual" for the Kansas City area; that management was a consideration in value; and that most leases require a minimum rental.

The experts for the plaintiff, Raymond H. Homan and Wayne Strong, testified generally: that they only considered the value of the land, building and equipment, which they stated, respectively, as $63,000 and $57,700; that they had the gallonage figures; one did not consider this on the valuation, as it would have required the "income approach"; the other considered it but not as a rule of valuation, because stations are not bought or sold strictly on gallonage; that there are not many stations in the area pumping 100,000 gallons per month; that leases in the area are not generally made on a gallonage basis, but on a percentage (negotiated) of the land value, a firm figure; that gallonage may have some value, but there are many other elements to consider, including the "quality" of the business; that rental value would be a vital consideration and an independent station might be leased on a gallonage basis with a minimum rental. One testified that in the oil industry the gallonage times a monetary figure is not any standard of market value; that the anticipated gallonage is considered, however, in figuring the anticipated profit and payout, and it is reflected in the value of the real estate. It was more or less conceded by defendants' witnesses that the value of the land and depreciated improvements were approximately $52,000, with no value added for gallonage.

We repeat, briefly, the sole contention of plaintiff on the appeal. It is: that the Court erred in permitting defendants' experts to testify to valuations based upon a loss of business, a non-compensable item, or to added values for the gallonage or business done by the station, over and above a fair market value for the land and improvements. These values were based upon

differing formulas applied by the witnesses, and they exceeded the $52,000 value, respectively, by $51,000, $83,000 and $113,000.

■ We have concluded that this evidence was improperly admitted. Hence, we must consider defendants' point that the objections were insufficient. Of course, it has long been the rule that timely objections or motions to strike testimony must be made. It would be useless to discuss defendants' cited cases on that general rule. Our appellate courts have not, in recent years, been quite so technical as they formerly were on this subject. The principle involved is that the objections to evidence and the basis therefor must be brought to the attention of the trial court in time for it to act. Upon a study of this record as a whole, it is apparent that the only real contested issue on the propriety of evidence was the use of this type of testimony to create an added value, over and above that of the land and improvements. In a colloquy between Court and counsel before the testimony began the matter of gallonage was mentioned and, in substance, plaintiff declined to stipulate on the amount, wanting to "stay away" from that. When defendant Winsborough was asked for the number of gallons pumped, plaintiff objected that no proper foundation had been laid "for the reasons previously stated to the Court when we were having a conference in chambers concerning this matter." Obviously the question had been discussed, but that discussion is not in the record. However, the Court then said, out of the presence of the jury, that as he understood the objection related to the "point" that there had been no evidence as yet that such is the way of "measuring the value of a business." Defendants asserted that such would be shown and the objection was overruled "with that understanding." Counsel for plaintiff asked if it might be agreed that "as to this entire line of testimony, until connected up," its objection might be continued and there was such an agreement. When Winsborough was asked how he arrived at his valuation and stated

that it was on the "number of gallons pumped" counsel objected that this was outside the knowledge of the witness, since he had never bought or sold a station and "a service station by itself outright is not * * *" (interrupted by counsel for defendants). Plaintiff also objected to testimony from that witness on the assumed rental value of $1,500 per month based on gallonage. The objection was renewed almost immediately and a motion to strike made because the evidence was outside the knowledge of the witness. This objection and motion were overruled.

On direct examination the expert witness Davies merely testified that he would "offer" $103,000 for the station, and that the damages were in that amount. On cross-examination he stated the basis for his valuation, namely: that the figure was $1.25 times 82,000 gallons (per month); that the "additional value" was due to the gallonage, and that it was based upon his judgment of "being able to keep and continue to do the same gas business." Upon re-direct the witness was asked if, on a going business, one must take the gallonage into consideration; plaintiff objected that this was an improper statement of the law—that plaintiff was not buying defendants' business, but his physical assets and that plaintiff objected to any testimony which included any compensation for defendants' "going business and for his business loss." The objection was sustained, but the Court was fully apprised of plaintiff's position on the subject. Upon another question regarding amortization of the $103,000 plaintiff objected that the $103,-000 contained improper elements. This was overruled. At the conclusion of the testimony of this witness, and just after he had stated that the difference between $52,000 and $103,000 was the value of the going business, plaintiff moved to strike that portion of the witness' testimony "in excess of $52,000, because it was based "upon an improper and not compensible item of damages of the man's business," and that the State was not purchasing his

business but his physical assets. The motion was further amplified in a colloquy which ensued, but it was overruled.

The witness Miller stated, as his opinion, a value of $135,000 and further stated that *"in his judgment"* a formula of $1.50 per gallon per month was proper; further, that he had "shrunk" the figure to $1.40 because the unit did not exactly "fit" the formula (not further explained). On cross-examination he stated that the gallonage was the test of "performance." At the end of his actual testimony, plaintiff moved to strike the testimony as to value "for the reason that he based it upon a multiplication of a dollars-and-cents figure times a number of gallons pumped, which is by his own testimony the business being done * * * and * * * includes an improper element of damage in that it includes an allowance with business being done on the station in addition to the fair market value of the real property * * *." This motion was overruled, after some further colloquy. The Court then asked, in the presence of the jury: "You are through with this witness?" and both counsel answered "Yes." The witness had apparently not been excused previously.

■ Robert H. McKee testified as previously outlined. There were no objections to his testimony. We note here that his testimony was essentially meaningless for, although he stated a value of $165,000, his method was to multiply the *annual* number of gallons by $1.50. This may have been an error, but it was never corrected, and he never stated the number of gallons he used.

■ We have concluded that plaintiff's objections were fairly and sufficiently raised. On the whole record the Court was advised of the State's position from the inception of the trial, and it so indicated by its own comment. In the direct testimony of Davies the actual method of computation was not brought out and plaintiff was entitled to develop on cross-examination the method used in order to specify its objections; this it did in a motion to strike.

Plaintiff also made pertinent objections on the redirect testimony. A detailed motion to strike was also made at the conclusion of the testimony of Miller, and *before* the witness was excused. Defendants say that, in any event, the evidence of the witness McKee was properly admitted because no objections were made. The principle is well established in Missouri that when a party has duly objected to a certain type of evidence and the objection has been overruled, he need not repeat the objection to further evidence of the same type. Brug v. Manufacturers Bank & Trust Co., Banc, Mo., 461 S.W.2d 269; Critcher v. Rudy Fick, Inc., Mo., 315 S.W.2d 421. The point is denied and we consider the admissibility of the evidence.

■ As already indicated, we hold that evidence of the valuations *added* to the value of the land, improvements and equipment and representing the business done or the value of the going business, by the use of individually selected formulas, was incompetent. As the witnesses themselves essentially admitted, this evidence was used to constitute an added value for the business being done or, as one expressed it, the value "of being able to keep and continue to do the gas business that this station was doing." Each witness used a different method of computation both on the number of gallons and the monetary unit applied in multiplying. One deducted the gallonage for diesel fuel and for *trucks*; one did not state the gallonage used; one used a figure of 98,000 gallons. The owner had stated the actual gallons pumped over a period of two years and eight months. But much more material is the fact that each witness used a different figure in his multiplication,—one $1.25, one $1.40 and one $1.50. This was completely inconsistent with a theory that there was a universal and standard method of computation in this industry in the location in question. In fact there was not, and hardly could have been, under these circumstances, any substantial evidence of any such general practice and custom. The use of three different, and apparently arbitrary, methods of computation proves in it-

self that there was no one standard method. There was some evidence of rental values but this was not followed up by evidence of market value by way of capitalizing the rentals. The *added* values were, respectively, $51,000, $83,000 and $113,000. These were clearly valuations added as a separate item for the business done by the station. The separate opinions given were actually valuations based upon an individual formula or method selected by the witness.

In Nichols, Eminent Domain, 3rd Ed., § 576, it is clearly indicated that the value of a *business* has never been held to be property in the constitutional sense, and that one is not entitled to compensation for the destruction of his business by the taking of his land; also, that the business is not considered in determining the value of the land, except to illustrate one of the uses to which the land may be put. See also In re Sixth Street, Banc, 276 Mo. 158, 207 S.W. 503.

There is some analogy in the case of State ex rel. State Highway Commission v. Meier, Banc, Mo., 388 S.W.2d 855, where the Court held that the loss of access and business to a filling station from a change in highway location and lessened traffic flow, was not compensable. In State ex rel. State Highway Commission v. Yackel, Mo.App., 445 S.W.2d 389, cited by defendants, the Court permitted evidence of the amount of gravel sold from the property being condemned as evidence of the quantity of gravel available as a part of the *land*. The Court noted that, loc. cit. 392, " * * * no effort was expended to make the gravel deposit the subject of a separate evaluation apart from the land where contained and add it to the farm as additional compensation for the taking." The Court further noted that there was no evidence indicating that the damages " * * * were based in any degree upon defendants' loss of profits or *injury to business*." (Italics ours.)

Defendants rely principally upon the case of St. Louis Housing Authority v. Bainter, Mo., 297 S.W.2d 529. There defendant owned a part of a filling station tract which was being condemned. The gallonage of the station was shown and there was testimony that " * * * there was a standard or formula in the oil business by which the fair market value and the reasonable rental value of a station was determined. He said the customary standard in the industry for determining the lowest possible selling or purchasing price of a station was the equivalent of one dollar per gallon 'pumped' at the station on the average per month; * * *." Other testimony followed to the same effect. An instruction was given that such testimony might only be considered on the question of the highest and best use of the property. There was no evidence from defendants as to the value of the land and improvements exclusive of an income valuation. The giving of the instruction was held to have been error. In holding that the jury could consider such evidence on the fair market value, the Court emphasized that the formula used was shown to be that used in the accepted custom and practice in the business. We consider that to be an essential part of the opinion. Fairly considered, there is no such evidence in the present case, and indeed any generally accepted standard is completely negated by the use of three different, and arbitrarily selected, standards. We do not consider the Bainter case to be controlling, or even persuasive on our facts.

Several cases cited in the Bainter case at loc. cit. 535 [9] hold generally that leases and rental values may be considered as bearing on fair market value. Evidence of rentals was admitted in the present case, but it was not computed into capitalized valuations.

▬ The testimony of an expert should be based upon some theory which has " 'gained general acceptance in the particular field in which it belongs.' " State v. Stout, Mo., 478 S.W.2d 368, 371. That rule should be applicable here where witnesses propose to use a specific method of computation as contrasted with mere general opinions of value. We do not hold that evidence of gallons pumped would not be ad-

missible for any purpose. It may be considered to show that the station is a going business, and as bearing upon the fair market value of the land generally.

The controverted evidence should have been stricken. There is no doubt that it was prejudicial. The judgment is reversed and the cause remanded.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

HENLEY and DONNELLY, JJ., concur.

MORGAN, P. J., concurs in result.